1  David R. Koch (NV Bar No. 8830)
   Daniel H. Stewart (NV Bar No. 11287)
2  KOCH & SCOW LLC
   11500 S. Eastern Avenue, Suite 210
3  Henderson, NV 89052
   Telephone:    (702) 318-5040
4  Facsimile:    (702) 318-5039

5  Attorneys for Benjamin E. Hoskins, Leanne Hoskins,
   Oxford Financial, LLC, and Dream Financial
6

7

8                  UNITED STATES DISTRICT COURT

9                  FOR THE DISTRICT OF NEVADA

10

11  FEDERAL TRADE COMMISSION,           Case No.: 2:11-cv-00283-JCM-GWF

12         Plaintiff,
    v.
13
    IVY CAPITAL, INC. et al.,           DEFENDANT BENJAMIN HOSKINS'
14                                       MOTION FOR SUMMARY JUDGMENT
15         Defendants, and
                                         [Oral Argument Requested]
16
    CHERRYTREE HOLDINGS, LLC, et al.,
17
           Relief Defendants
18

19

20         Defendant Ben Hoskins hereby moves pursuant to Rule 56 of the Federal Rules of Civil

21  Procedure for summary judgment on Plaintiff Federal Trade Commission's (FTC) claims against

22  Mr. Hoskins as an individual.  Hoskins further moves for a judgment that there is no basis for

23  equitable monetary relief to be imposed against him individually in this action.

24         This motion is made on the grounds that the FTC has discovered or produced no evidence

25  to support a claim for individual liability against Mr. Hoskins.  The undisputed facts show that

26  Mr. Hoskins did not actively participate in or control the acts at issue in this case, nor did he

27

1   have actual knowledge or reckless indifference with respect to the conduct alleged to be
2   improper.

3        This motion is based on the following Memorandum of Points and Authorities, the papers
4   and pleadings on file herein, and any oral argument that this Court wishes to entertain on the
5   matter.

6   Date: August 8, 2012                    **KOCH & SCOW LLC**

7
                                            /s/ David R. Koch
8                                           David R. Koch
                                            Attorneys for Benjamin E. Hoskins, Leanne Hoskins,
9                                           Oxford Financial, LLC, and Dream Financial

10
11
12                    **MEMORANDUM OF POINTS AND AUTHORITIES**

13  **I.     INTRODUCTION**

14        Discovery is now closed, and the case against Mr. Hoskins for individual liability is non-
15  existent.  The FTC has gathered or produced no evidence that would give rise to a triable issue as
16  to whether Mr. Hoskins would be individually liable under the FTC's causes of action.  In fact,
17  discovery has proven just the opposite: Mr. Hoskins had no meaningful participation in any of
18  the conduct alleged to constitute violations, and he in fact took certain affirmative steps to
19  ensure his general understanding of legal compliance.

20        The FTC's Complaint in this matter alleges that Ivy Capital and other corporate and
21  individual defendants violated Section 5 of the FTC Act by engaging in a scheme to sell
22  "business coaching" to customers based on misrepresentations regarding customers' ability to
23  earn substantial income from their Internet business endeavors and misrepresentations
24  regarding the company's refund policy.  The Court entered a preliminary injunction at the
25  request of the FTC, restraining and enjoining representations regarding customers' likelihood of
26  business success and regarding the company's refund policy.  (Court Doc. #91, pp. 7-9.)

27

1    Throughout this proceeding, the FTC has simply lumped all of the individual defendants
2    together as being part of the same conduct and level of involvement.  In fact, when the FTC was
3    pressed in written discovery to spell out the basis for Hoskins' individual liability, the FTC
4    responded by listing general facts and pointing to general documents to support their overall
5    theory of the case without any explanation how those facts or documents related to Hoskins as
6    an individual.  The FTC's inability to provide any factual basis to support its individual claims
7    against Hoskins demonstrates that the FTC cast its initial net far too wide.  And since the FTC
8    will not voluntarily scale back its net, the Court should do so now.

9    With this Motion, Hoskins submits abundant evidence from numerous individuals both
10   within and without the company.  This evidence demonstrates that while Hoskins owned a
11   portion of the company (a percentage that declined from the inception to the time period
12   relevant to this dispute), he had only passive involvement and no direct control over the
13   operations, policies, and procedures of the entity.  Even the primary witness supporting the
14   FTC's motion for preliminary injunction admitted that Hoskins was only a "silent partner" with
15   little day-to-day involvement in the business.  Other individual defendants and employees of the
16   company have repeatedly testified in depositions and affidavits that Mr. Hoskins' role was
17   minimal and limited to assistance in overall corporate and financial planning.

18   In addition, the evidence demonstrates that Mr. Hoskins actually went to the length of
19   ensuring that the company had private attorneys and the Utah Attorney General review the
20   business's materials and products to confirm that there were no issues in the product offerings.
21   If an individual were "recklessly indifferent" to the propriety of the company's conduct, he
22   would never have sought confirmation from an Attorney General and private attorneys
23   regarding the contents of the company's materials.

24   The FTC has not and cannot establish that Hoskins actively participated in the conduct at
25   issue, that he directed or controlled the conduct, or that he was recklessly indifferent to
26   knowledge of the same.  In fact, Hoskins' conduct demonstrated a desire to ensure compliance
27   with applicable rules and regulations.  Accordingly, in the absence of any meaningful evidence

provided by the FTC, Hoskins asks this Court to enter summary judgment in his favor with respect to the claims for individual liability against him in this matter.

## II.   STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 56-1, Hoskins provides the following statement of undisputed material facts in support of his Motion for Summary Judgment:

1.      Hoskins was one of four owners of Ivy Capital, the primary corporate defendant in this proceeding. (Hoskins Decl., ¶2.)

2.      Defendants Kyle Kirschbaum, Steve Lyman, and John Harrison were the other owners of the company and did "all the leg work…to make this thing operate." (*See* Exhibit 5, (Harrison)[1], at 34:15-23.)

3.      Kirschbaum, Lyman, and Harrison were each former employees of PMI, a business providing similar business coaching services as Ivy Capital, prior to their founding of Ivy Capital. (Ex. 4 (Lyman) at 281-282.)  Hoskins was never employed by PMI or any other business-coaching operation, nor did he previously have any operational experience in any business-coaching company, and thus had no personal experience in the industry.  (Hoskins Decl., at ¶3.)

4.      Hoskins did not serve as a corporate officer or employee of Ivy Capital. (*Id.*, at ¶4.) Nor did he serve as an officer or director of any of the "primary" or "upsell" defendants named in this action. (*Id.*)

5.      Hoskins initially was given 40 percent ownership of Ivy Capital by virtue of his capital investment in the entity, but due to his lack of involvement in the business this percentage was reduced to 25 percent by 2007, which is the time period relevant to the present dispute. (*Id.*, at ¶5; *see also* Ex. 4 (Lyman) 30:11-18.)

6.      The FTC alleges that Ivy Capital and the individual defendants violated Section 5 of the FTC Act by selling "business coaching" to customers using misrepresentations regarding

---

[1] Exhibits 3-11 are depositions that have been taken in this case.  For ease of reference, these depositions are referenced by their exhibit number and also by the last name of the deponent.

1  the customers' ability to earn income and by failing to adequately disclose material aspects of the
2  refund policy. (Court Doc. #11-1 at 39-44.)  The FTC also alleges that this same conduct violates
3  the Telemarketing Sales Rule. (*Id.* at 45-47.)

4        7.      Hoskins was not involved in sales nor was he involved in setting policies,
5  procedures, or creating sales scripts or other communications that are at issue in this case.
6  Hoskins did not participate in sales calls, close any deals, or listen to phone calls that were being
7  made, nor was he shown sales scripts that were being used. (Ex. 3 (Kirschbaum), 40:5-42:1); (Ex.
8  4 (Lyman), 27:23-24).

9        8.      Hoskins' role at the start of Ivy Capital was to help find "lead relationships" to
10 provide to Ivy Capital for its marketing efforts. (Ex. 4 (Lyman), 24:25-25:8.)  These lead
11 relationships were simply businesses with customers who may also be interested in the products
12 Ivy Capital was offering.  Hoskins was primarily involved in developing relationships with
13 other businesses and also in providing overall strategic guidance. (Ex. 4 (Lyman), 242:15-21;
14 254:1-16; 282:24-283:17; 293:11-294:21.)

15       9.      Hoskins did not have dedicated desk or office space at Ivy Capital. (Ex. 4 (Lyman),
16 26:10-11; Hoskins Decl., ¶6.)

17       10.     Hoskins did not have any role at the Business Development Division/Zyzac
18 Commerce Solutions or any of the other business entities. (Ex. 3 (Kirschbaum), 44:20-45:5; 50:13-
19 51:1; 57:11-59:6.) (Ex. 6 (Zelig), 23:14-23; 44:3-8) (*Id.*, at 46:8-19; 79:3-7.) (Ex. 4 (Lyman), 161:4-20;
20 261:3-10.)

21       11.     Hoskins would occasionally check in at the Ivy Capital office location, but he had
22 no defined role at the company. (Ex. 5 (Harrison), 42:1-12.)  When Hoskins was in the office, it
23 was only for brief periods of "once every two months for 15 minutes" or so, and he was not
24 involved in the day-to-day operations when he was there. (Ex. 3 (Kirschbaum) 320:17-321:2.)

25       12.     Hoskins "was not involved in day-to-day operations" of the company and did not
26 give day-to-day direction to employees. (Ex. 7 (Woodward), 317:17-319:18.)

27

1     13.     Hoskins did not have a role in the decision-making processes of the company,  (Ex.

2  7 (Woodward), 176:1-182:5), and generally did not contribute to decisions made at the company

3  (Ex. 7 (Woodward), 74:18-75:10; 187:13-21.)

4     14.     Hoskins was not involved in the hiring or training of business coaches at Ivy

5  Capital. (Ex. 3 (Kirschbaum), 296:15-17.)

6     15.     Hoskins was not involved in the refund process at Ivy Capital.  (Ex. 3

7  (Kirschbaum), 316:5-15.)

8     16.     Hoskins did not regularly participate in management meetings of the company.

9  (Ex. 3 (Kirschbaum), 329:1-332:8.)

10     17.     Aside from infrequent global management meetings where "major strategic

11  developments" and a "review of the financial statements" took place, one employee never saw

12  Hoskins at the office,  (Ex. 7 (Woodward), 181:12-183:18; 318:2-319:18) and had only limited

13  interaction and discussions to a "much lesser degree" with Hoskins than other owners. (Ex. 7

14  (Woodward), 86:16-24; 318-319.)

15     18.     Hoskins was the only owner who was not at a meeting with James Hanchett when

16  he met with Ivy Capital partners about certain business practices of Matt Rasmussen that

17  Hanchett was concerned about.  Hanchett met Hoskins once or twice but never had much

18  contact with him, as opposed to other Ivy partners.  (Ex. 8 (Hanchett) 86:12-87:25; 95:25-97:13.)

19     19.     Hoskins did not participate in training business unit managers, as did the other Ivy

20  partners. (Ex. 8 (Hanchett), 165:8-166:25; 202:23-204:7.)

21     20.     Unlike the other owners, Hoskins never visited the Utah office operated by

22  Hanchett. (Ex. 8 (Hanchett-Day 2) 116:17-23.)

23     21.     Josh Wickman, one of the founders of Enrich Wealth Group, did not know what

24  Hoskins' role was at the company, and he saw Hoskins once in California and 3-4 times in Las

25  Vegas when he would meet for dinner or similar occasions.  (Ex. 9 (Wickman), 286:20-288:5.)

26

27

28

22.     Michael Allen, another of the founders of Enrich Wealth Group, interacted with Mr. Hoskins only about Oxford Debt Solutions fulfillment clients regarding debt settlement and interest reduction issues that are not part of the claims in this case. (Ex. 10 (Allen), 55:6-57:3.)

23.     The only individuals at Ivy Capital with whom Allen communicated regularly were Harrison, Kirschbaum, Lyman, and an administrative staff member. (Ex. 10 (Allen), 54:2-55:9.)

24.     Mr. Hoskins was informed by the other owners of Ivy Capital that the scripts and policies of the companies had been and were being reviewed by the company's attorneys, and that the attorneys had advised that the materials were in compliance with governing law. (See, e.g., Ex. 3 (Kirschbaum), 130:10-131:11.)

25.     Mr. Hoskins met with the Utah Attorney General, who reviewed an infomercial produced for the company and told Hoskins that with a couple of minor modifications, the infomercial was in accordance with the law. Mr. Hoskins never received any information to the contrary. (Hoskins Decl., ¶28.)

26.     No witness has testified, nor has there been any documentary evidence that Mr. Hoskins took part or was even aware of any of the alleged acts or misrepresentations that the FTC believes were misleading or otherwise unlawful.

## III.    LEGAL ARGUMENT

### Summary of Argument

Hoskins cannot be held liable individually for injunctive relief or for equitable monetary relief.  Under the standard for injunctive relief, the FTC must demonstrate that Hoskins "participated directly in the unlawful acts or practices or had authority to control them." Hoskins' mere ownership of a declining share of Ivy Capital is insufficient to satisfy this standard.  With respect to equitable monetary relief, the FTC must show more—it must demonstrate that Hoskins "had actual knowledge of a material misrepresentation, was recklessly indifferent to the truth or falsity of a misrepresentation, or had awareness of a high

probability of fraud along with an intentional avoidance of the truth." The FTC has produced no evidence "on which a reasonable jury could reasonably find for [the FTC]" in this regard. Simply alleging that Hoskins was aware of the operation of the nature of the business in question does not demonstrate that he had knowledge or reckless indifference toward the misrepresentations the FTC complains of in this case.

The undisputed testimony from numerous witnesses other than Hoskins himself consistently shows that Hoskins was a "silent partner" who did not participate in the day-to-day operations of the company. Numerous individuals—including other owners—did not even know what, if anything, his role was at the company. Hoskins did not set sales policies or practices and had no personal involvement in the conduct in question. To the contrary, Hoskins received confirmation both from private attorneys and from the Utah Attorney General regarding legal compliance of the company's practices. Applying these facts to the legal standards, summary judgment in Hoskins' favor is appropriate.

## A. Summary Judgment Is Appropriate Because the FTC Cannot Meet Its Legal Or Evidentiary Burdens

"The purpose of summary judgment is to avoid unnecessary trials where there is no dispute as to the facts before the court." *Queen v. Hard Rock Hotel & Casino*, 2011 WL 6753011 *2 (D. Nev. Dec. 22, 2011). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Under the federal standard a moving defendant may shift the burden of producing evidence to the nonmoving plaintiff merely by 'showing' – that is, point out through argument, the absence of evidence to support plaintiff's claim." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 325).

In order to prevail on a motion summary judgment for lack of evidence, the party that does not bear the burden of proof on a particular issue at trial must "show that the nonmoving

1   party does not have enough evidence of an essential element to carry its ultimate burden of

2   persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

3   A non-moving party that does not bear the burden at trial need only demonstrate the lack of a

4   triable issue relating to *any* essential element of the non-movant's claim because "complete

5   failure of proof concerning an essential element of the nonmoving party's case necessarily

6   renders all other facts immaterial." *Id.* at 323.  Summary judgment is appropriate when

7   plaintiff's testimony is "largely unsubstantiated by any other direct evidence" and "so replete

8   with inconsistencies and improbabilities that no reasonable juror would undertake the

9   suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys v. City*

10   *of New York*, 426 F.3d 549, 551 (2d Cir. 2005) (internal citations omitted).

11        In short, at the summary judgment phase of the proceeding, a non-moving plaintiff must

12   carry the "burden of production" by demonstrating that there is sufficient evidence favoring the

13   nonmoving party for a jury to return a verdict for that party. *See Anderson v. Liberty Lobby*, 477

14   U.S. 242, 249 (1986).  A non-movant plaintiff must "do more than baldly deny the reasonable

15   inferences and facts." *Lorillard Tobacco Co., v. A&E. Oil, Inc.*, 503 F.3d 588, 594-5 (7th Cir. 2007).

16   Although all reasonable inferences must be drawn in favor of the non-moving party, these

17   inferences must be drawn only to "the extent supportable by the record." *Scott v. Harris*, 550

18   U.S. 372, 381 n.8 (2007).  The non-movant must show something more than "metaphysical doubt

19   as to the material facts." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009).

20        Because the FTC bears the burden of proof at trial, it must bring forth evidence

21   demonstrating the existence of a genuine issue of material fact for each of the essential elements

22   of its claims against Mr. Hoskins.  To "baldly allege" the existence of evidence, or to merely

23   deny the substance of Hoskins' arguments is not enough.  The FTC must proffer evidence that

24   would support a reasonable inference in its favor.

25        **B.        The FTC Has No Evidence Supporting Individual Liability Against Mr. Hoskins**

26        Throughout this case, the FTC has done little to recognize the minimal role of Mr.

27   Hoskins in the business activities at issue.  Yet as courts have recognized, "[i]t is axiomatic that

28

9

1 | each defendant is entitled to an individualized determination of his interests." *FTC v. Kuykendall,*

2 | 371 F.3d 745, 758 (10th Cir. 2004).

3 | In this case, the FTC alleges that Ivy Capital and the individual defendants violated

4 | Section 5 of the FTC Act by selling "business coaching" to customers using misrepresentations

5 | regarding the customers' ability to earn income and by failing to adequately disclose material

6 | aspects of the refund policy. (Court Doc. #11-1 at 39-44.) The FTC also alleges that this same

7 | conduct violates the Telemarketing Sales Rule. (*Id.* at 45-47.)   The FTC has not explained

8 | Hoskins' individual connection to this activity.

9 | In order to hold Mr. Hoskins individually liable for the claims made in this case, he

10 | cannot simply be lumped in with each of the other owners of Ivy Capital.  Rather, the FTC must

11 | demonstrate that he "participated directly in the unlawful acts or practices or had authority to

12 | control them."  *FTC v. Publishing Clearing House, Inc.,* 104 F.3d 1168 (9th Cir. 1997).  In

13 | determining whether an individual has authority to control, the FTC must prove active

14 | involvement in the business affairs and making of corporate policy.  *FTC v. Am Standard Credit*

15 | *Systems, Inc.* 874 F.Supp. 1080 (C.D. Cal. 1994).

16 | In addition to injunctive relief, the FTC is seeking to hold Hoskins liable for equitable

17 | monetary relief totaling $154 million in gross revenues received by Ivy Capital during the

18 | relevant time period. Though Hoskins received relatively modest salary and distributions from

19 | the profits of the company based on his ownership interest, the FTC would have this Court hold

20 | him liable for entire gross revenues of a business in which he had limited involvement. This

21 | type of financial death sentence has no tether to "equitable monetary relief," where the FTC has

22 | not demonstrated any connection between Hoskins and the actual conduct in question.

23 | Courts recognize that to impose Section 5 injunctive relief against an individual, the FTC

24 | must establish corporate liability under Section 5 and then prove that "an individual

25 | participated directly in the acts in question or had authority to control them."  *FTC v. Garvey*, 383

26 | F.3d 891, 900 (9th Cir. 2004) (quoting *FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168 (9th Cir.

27 | 1997)).  But to impose equitable <u>monetary</u> relief against an individual defendant, "the FTC must

1  also show that the individual had actual knowledge of a material misrepresentation, was

2  recklessly indifferent to the truth or falsity of a misrepresentation, or had awareness of a high

3  probability of fraud along with an intentional avoidance of the truth." *Id.* (emphasis added);

4  *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 573 (7th Cir. 1989) (same) (quoting *FTC v. Kitco of*

5  *Nevada, Inc.*, 612 F.Supp. 1282, 1292 (D.C. Minn. 1985)).

6        As a result, merely being an officer or director of a company is not sufficient to impose

7  equitable monetary relief, as "the FTC must show a heightened standard of awareness beyond

8  the authority to control." *See FTC v. Freecom Communications, Inc.*, 401 F.3d 1192, 1207 (10th Cir.

9  2005). Moreover, because the FTC's burden is based on individual "actual knowledge," the FTC

10  must meet its burden as to each individual defendant and cannot simply lump defendants

11  together. *See McGregor v. Chierico*, 206 F.3d 1378, 1383-84 (11th Cir. 2000) (agreeing with

12  defendant's claim that the FTC and district court erred in "simply lump[ing] together all of the

13  defendants without considering the weight of the evidence as it applied to each individual and

14  corporate defendant"); *FTC v. Kuykendall*, 371 F.3d 745, 762 (10th Cir. 2004) (rejecting an attempt

15  to lump defendants together and finding that "each individual is entitled to an individualized

16  determination of his interests") (citations omitted). In this case, the FTC has no meaningful

17  evidence of "actual knowledge" against Hoskins, and the District Court should find that there is

18  insufficient evidence to allow these claims to proceed to trial.

19        This Court's ruling in *Garvey* makes the point clear: having authority to control the acts in

20  question is not enough to impose individual liability for monetary relief. Rather, the FTC must

21  also show either "actual knowledge," "reckless[] indifferen[ce]," or "intentional avoidance of the

22  truth." *Garvey*, 383 F.3d at 900.

23       **C.**    **The FTC's Discovery Responses Demonstrate the Absence of a Triable Issue**

24        In response to interrogatories pointedly asking the FTC to provide facts and evidence

25  demonstrating Mr. Hoskins' individual culpability, the FTC produced only general claims and

26  evidence that relates to the entire Ivy Capital enterprise and not to Hoskins individually. (*See*

27  Exhibit 2, "Plaintiff Federal Trade Commission's Objections and Responses to Defendant

Benjamin E. Hoskins's First Set of Interrogatories", at 13:7-14:24.)  When the FTC was asked to provide evidence demonstrating that Hoskins "formulated, directed, controlled, had authority to control, or participated in the acts and practices set forth in this Complaint," the FTC provided no specific facts whatsoever in response.  Instead it simply directed Hoskins to try to find the facts by reviewing: (1) "various depositions," (2) the declaration of one of its investigators, Sheryl Novick, (3) "other PI exhibits referenced in the FTC's TRO/PI pleadings," and (4) the declaration of Kyle Kirschbaum.  (Ex. 2, Response to Interrogatory No. 9 at p. 22.)

This response was meaningless.  As discussed below, the "various depositions" in the case all point to the same facts that Hoskins was a "silent partner" with minimal direct involvement with the company.  Sheryl Novick's declaration says nothing about Hoskins other than claiming he once signed a merchant account application.  The FTC never produced an application that Hoskins signed, and the documents the FTC did provide were not signed by Hoskins. (Hoskins Decl., ¶27.)  What the "other PI exhibits" may refer to is anyone's guess.  And Kyle Kirschbaum's declaration from March 15, 2011 only describes Hoskins' partial ownership of Ivy Capital and connection with other entities ancillary to the proceedings.   None of this information demonstrates "active involvement" or direct participation in the unlawful acts or practices.

When this is all the FTC has to prove its case, it has utterly failed to carry its burden.  In the absence of any meaningful evidence in support of its claims against Hoskins as an individual, summary judgment can and should be entered in Hoskins' favor, especially in light of the overwhelming evidence of Hoskins' extremely limited involvement in the company, as described below.

### D.   The Testimony of Other Defendants Demonstrates Hoskins' Limited Involvement

In his attached declaration (Ex. 1), Hoskins describes his role and limited involvement in the operations, policies, and activities of the entities at issue.  If Hoskins were to rely solely upon his own declaration regarding his level of involvement in the company, the FTC would likely

argue that the statements are self-serving and of limited utility for purposes of summary judgment. Perhaps more important than Hoskins' direct testimony, therefore, is the following sworn testimony of <u>numerous</u> individuals deposed in this case regarding Hoskins and their involvement and connections with him. Those with the most direct information regarding the participation of the parties have repeatedly and consistently testified regarding Hoskins' limited involvement with the company and lack of involvement with respect to the activities in question.

**Ivy Capital Owners:**

**Kyle Kirschbaum** – Kirschbaum is the president of Ivy Capital. Kirschbaum testified at deposition that Hoskins became involved in the company solely because of connections with lead generation sources, and he did not participate in sales calls, close any deals, or listen to phone calls that were being made, nor was Hoskins ever shown sales scripts that were being used. (Ex, 3 (Kirschbaum) 40:5-42:1.) Hoskins did not have a space at the office and was at the office maybe once per month. (*Id.* at 44:10-45:5, 50:13-51:1, 57:3-59.) When he was there, Hoskins was only in the office for brief periods of "15 minutes" or so, and he was not involved in the day-to-day operations at Ivy Capital. (*Id.* at 320:8-321:2.). Hoskins was not involved in the hiring process or in the refund process at Ivy Capital. (*Id.* at 316:5-15.) Hoskins did not regularly participate in management meetings of the company. (*Id.* at 329:4-332:5.)

**Steve Lyman** – Lyman was one of the owners of Ivy Capital. He testified that Hoskins was involved at the start of the company in finding "lead relationships" to market to customer bases of other businesses. (Ex. 4 (Lyman), 24:15-25:8.) Hoskins did not have a desk or office space at the company and was not involved in sales or in preparing scripts (*Id.* at 26:1-28:7, 33:6-17), nor did he have any role at the Business Development Division/Zyzac or any of the other business entities. (*Id.* at 161:4-20, 261:3-8.) Hoskins instead was primarily involved in developing relationships with other businesses or contacts. (*Id.* at 242:15-21, 254:1-16, 282:24-283:17, 293:8-294:21.)

**John Harrison** – Harrison was the final owner of Ivy Capital. Harrison testified that Hoskins was involved with Ivy Capital because he had a relationship with a fulfillment provider, he knew how to get a merchant account, and he had lead relationships. Other than this, Harrison explained that the other owners would "do all the leg work…to make this thing operate." (Ex. 5 (Harrison), 34:8-23.) Hoskins would occasionally check in with the business but had no defined role at the company. (*Id.* at 41:20-42:12.) Hoskins had no involvement in calls or compliance. (*Id.* at 48:6-21.) Hoskins was not often in the office and did not contribute to decisions made at the company generally. (*Id.* at 74:18-75:10, 187:13-21.)

It should be noted that each of the other three owners—Kirschbaum, Lyman, and Harrison—were each formerly employed at PMI, another business coaching company based in Utah. (*See, e.g.*, Ex. 5 (Harrison) at 14-16.) Each of these individuals testified that they brought business processes and information from their former company to use at the Ivy Capital business. (*See* Ex. 3 (Kirschbaum), 39:4-41:5.). Hoskins, on the other hand, did not work at PMI, nor did he have any personal experience in the business coaching industry. (Hoskins Decl., ¶3.) The descriptions of Hoskins' limited responsibility provided by each of the owners, therefore, align with the respective experience—or lack thereof—of each individual.

**Other Defendants:**

**Josh Wickman** – Wickman was responsible for the Enrich Wealth Group operation in California, which provided sales services for Ivy Capital. Wickman explained at his deposition that he did not know what Hoskins' role was at the company, and that he saw Hoskins once in California and perhaps 3-4 times in Las Vegas, when he would meet for dinner or similar occasions. (Ex. 9 (Wickman) at 286:20-288:2.)

**Chris Zelig** – Zelig operated the Business Development Division, also known as Zyzac Commerce Solutions. Zelig testified that he did not know what Hoskins' role was at the company and that Hoskins did not have a direct role in Zelig's business operation.

1    (Ex. 6 (Zelig), 23:14-23, 44:3-11.)  Zelig also explained that Hoskins did not often attend

2    meetings about the company. (*Id.* at 46:8-15, 79:3-7.)

3    There is no testimony whatsoever demonstrating or establishing Hoskins' knowledge of

4    or involvement in the conduct deemed to be at issue here—namely, purported

5    misrepresentations during sales calls that consumers who purchase the business coaching

6    program are likely to earn substantial income and misrepresentations regarding the company's

7    refund process and difficulties in actually obtaining a refund.  Nor was there any testimony or

8    evidence with respect to Hoskins' authority to control such conduct in his capacity as an owner

9    without day-to-day responsibilities at the company.

10   **E.     The Testimony of Other Employees and Third Parties Demonstrates Hoskins'**

11   **Limited Involvement**

12   In addition to the defendants who have testified at deposition, numerous other witnesses

13   have provided declarations or sworn statements in this case, all of which demonstrate Hoskins'

14   passive involvement with the company.  Even the primary witnesses that the FTC apparently

15   would call to support its case admit the limited nature of Hoskins' involvement.

16   **Robert Payne** – First and foremost, Robert Payne, the FTC's "star witness" (a

17   former employee of Ivy Capital who turned whistleblower), expressly stated that Ben

18   Hoskins "acts as a silent partner – he is a part owner but is less involved in day-to-day

19   operations.  I saw him only occasionally." (Ex. 12, R. Payne Declaration, ¶5.)  Payne first

20   worked at Ivy Capital from 2008 to early 2010 and was later a setter and a closer at

21   Business Development Division within Ivy Capital and began working there in February

22   2010. (Ex. 11 (Payne), 18:21-20:5; 36:1-17.)  While Payne provided the most direct

23   testimony regarding the practices giving rise to the FTC's Complaint, he had no

24   information or testimony regarding Hoskins' involvement, because there was none.

25   During Payne's deposition, he reaffirmed this characterization of Hoskins, stating

26   that Hoskins was not regularly involved with the company and that Payne met him

27   "three or four times."  He was told by Steve Lyman and by Chris Hamm that Hoskins was

1    a "silent partner." (Ex. 11 (Payne), 72:4-73:8.) He also believed that Anthony DiBello
2    informed him that Hoskins was a "silent partner." (*Id.*)

3    By definition, a "silent partner" is "a business partner who provides capital but
4    does not actively participate in the management of operations."[2] That description aptly
5    capsulizes the descriptions provided by the host of witnesses who have been deposed in
6    this case.

7

8    Among the remaining volumes of evidence the FTC submitted to obtain the preliminary
9    injunction, not a single witness provided any information regarding Hoskins' direct personal
10   involvement in any of the conduct at issue. In fact, declarants Holly Navarro, Renee Lightford,
11   Randy Tuckett, and Jennifer Rodden did not even mention Hoskins or describe any activities
12   attributable to him. (Court Doc. #11, Exs. 13, 14, 15, 20 (these declarations are included
13   collectively as Exhibit 13 to this Motion).) The other declarants, Sheryl Novick and Christine
14   Perrotti, were FTC employees who mention only that Hoskins was one of the owners and was a
15   signer on certain bank accounts. (Attached to Court Doc. #11 as Exs. 21 and 22.) Mere status as
16   a signer on a bank or merchant account, however, provides no basis to impose any individual
17   liability for the practices complained of in this action.

18   Depositions and declarations of numerous other non-party witnesses point to the same
19   facts:

20   **Michael Allen** – Allen opened Enrich Wealth Group with Josh Wickman in 2007.
21   Allen testified that he interacted with Ben Hoskins about Oxford Debt Solutions with
22   respect to debt settlement and interest reduction issues that are completely unrelated to
23   the claims in this case. (Ex. 10 (Allen), 55-56.) Allen was also asked about the individuals
24   with whom he communicated with at Ivy Capital, and he explained that the only

25

26   [2] http://www.investorwords.com/4577/silent_partner.html.

27   See also: http://en.wikipedia.org/wiki/Partnership: "A silent partner is one who still shares in the
     profits and losses of the business, but who is uninvolved in its management."

28

1   individuals he communicated with regularly were Harrison, Kirschbaum, Lyman and an

2   administrative staff member, but no one else on a regular basis. (Id. at 54.)

3   **Kevin Woodward** – Woodward came to the Business Development Division in

4   2010 as a financial consultant. Woodward testified that Hoskins "was not involved in

5   day-to-day operations" of the company and did not give day-to-day direction to

6   employees. (Ex. 7 (Woodward), 317:17-319:18.) He also explained that Hoskins did not

7   have a role in the decision-making processes of the company and generally did not

8   contribute to decisions made at the company. (Id. at 74:18-75:10, 176:1-182:5, 187:13-21.)

9   Woodward went on to explain that aside from infrequent global management meetings

10   where "major strategic developments" and a "review of the financial statements" took

11   place, he never saw Hoskins at the office. (Id. at 181:12-183:18; 318:2-319:18). Woodward

12   had limited interaction and discussions to a "much lesser degree" with Hoskins than with

13   the other owners. (Id. at 86:16-24; 318-319.)

14   **Brian Fisher** – Fisher was the Executive Director and manager of the day-to-day

15   operations at Global Finance Group, one of the corporate defendants in the case. (Ex. 14,

16   ¶2.) Fisher stated that Hoskins never participated in the daily activities of Global, never

17   participated in any meeting they had regarding Global, and he did not know of any

18   responsibilities or oversight duties Hoskins had. (Ex. 14, ¶3.)

19   **Jeremy Cheney** – Cheney was the floor sales manager who oversaw all daily

20   operations of the sales floor. Cheney explained the Hoskins had "no responsibilities in

21   the company," had "no oversight duties," and "was not involved in any day-to-day

22   business activity." Cheney explained that he understood Hoskins' role to be a "silent

23   partner" with a "financial assistance role." (Ex. 15, ¶ 4.)

24   **Jerry Kubicki** – Kubicki worked as a sales consultant for Business Development

25   Division. He understood Hoskins' role to be a "venture capitalist" with no participation

26   in the daily activities or oversight of the company. (Ex. 16, ¶¶2-5.)

27

28

**Jenny Coplin** – Coplin working for Global Finance Group preparing marketing materials and creating online offers to generate leads. (Ex. 17, ¶2.) Coplin stated that Hoskins had no involvement in the daily activities of the company, no oversight, and no responsibilities. Coplin also stated that Abraham Hwang "created the policies and procedures of Global," (Ex. 17, ¶7), yet the FTC did not even include Hwang as a defendant in this action.

In addition, Coplin testified that lawyers in New York reviewed the sales copy of the offers made by the company, including a review of the "privacy policy, terms and conditions, and disclaimer." (Ex. 17, ¶5.) As described in Hoskins' Declaration and discussed further below, the fact that attorneys reviewed sales materials gave Hoskins reasonable reliance regarding the appropriateness of the materials and practices of the company in conducting its business operations.

**Jeremy Pike** – Pike was director of finance and corporate controller at Ivy Capital. He managed the accounting department and records at the company. Pike testified that it was rare to see Hoskins at the office, and his interaction was mainly limited to monthly financial meetings that the company had. (Ex. 18, ¶3.) And though Ben was a signer on Chase bank accounts, he rarely signed checks and only when no other signers were available. (*Id.*) Additionally, Pike stated that Hoskins was not a supervisor and did not direct the affairs of the accounting department. (*Id.*)

There has been no deposition testimony in this case demonstrating active participation in the conduct described, let alone the heightened standard of actual knowledge or reckless indifference necessary to impose monetary relief. The testimony on these points is consistent and clear—Hoskins was a "silent partner" who provided overall strategic guidance and early startup capital and connections. He was not personally connected to the conduct in question and cannot be found liable based on the FTC's generic evidence.

F.   **Hoskins Took Affirmative Steps to Ensure Compliance and Had a Good Faith Belief of the Same**

Absent evidence of actual knowledge or reckless indifference of the purported false representations, the FTC is left with proving that Hoskins "intentionally avoided the truth." *See FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 573 (7th Cir. 1989). The evidence adduced through discovery demonstrates that exactly the opposite was true. Rather than put his head in the sand in hopes of avoiding knowledge, Hoskins took affirmative steps to confirm that the representations and sales materials being used by the company were appropriate. Hoskins was provided with information from Kyle Kirschbaum that the company's refund policies, sales scripts, and customer agreements had been provided to the company's attorneys in New York and Colorado for review to ensure the materials were legally compliant. (Ex. 19) Hoskins relied on the fact that attorney David Klein—who had substantial experience in FTC compliance and requirements—and others advised Ivy Capital with respect to its marketing materials and sales activities. (Hoskins Decl., ¶ 23; Ex. 19). And the attorney in Colorado was an FTC specialist at Greenberg Traurig, whom Hoskins believed and understood to be providing meaningful advice regarding the company's procedures and policies. (Hoskins Decl., ¶24.)

In one instance, Hoskins went further when he took an infomercial produced by the company to the Utah Attorney General to sit down with a representative and view the entire infomercial. Hoskins had a contact in the Attorney General's office and thought it prudent to determine if there were any concerns with the materials being used by the company. (Hoskins Decl., ¶28.) After viewing the infomercial, the Attorney General's office informed Hoskins that the program was quite good and only asked for a modification regarding the placement of a disclaimer during one part of the infomercial. That change was made, and Hoskins believed that this sales material was thus appropriate and proper. (*Id.*)

Additionally, Hoskins was sent customer success stories by James Hanchett and others detailing successes that clients were having with the business coaching services Ivy Capital was offering. (Hoskins Decl., ¶15 ; *see also* Ex. 4 (Lyman) 295:9-296:17; Ex. 9 (Wickman) 174:22-25;

178:3-16.).  These testimonials or success stories were provided to Hoskins in order to demonstrate the effectiveness of the services he understood it to be offering.

While Hoskins was therefore not personally involved in the daily business practices or policies and procedures of the company, he did take reasonable efforts to confirm for himself that the business was making reasonable marketing efforts devoid of the types of misrepresentations that the FTC has alleged in this case.  There is no basis to impose equitable monetary relief against Hoskins based upon the facts of the case.

**G.      FTC's Anticipated Response Is Nothing More than Evidence that Hoskins Had Limited Authority to Handle Financial Aspects of the Business**

Throughout this proceeding, the FTC has generically claimed that mere ownership and general participation in ownership meetings and telephone calls is sufficient to establish individual liability.  But the mere participation in the business of a company is not sufficient to establish individual liability—if it were, virtually every employee or owner of a company would automatically be individually liable for the types of violations claimed here.  That is not the law. Simply providing financial assistance and receiving distributions from a company does not establish personal knowledge and ability to control the practices at issue.  Nor does the authority to sign off on contracts or bank accounts demonstrate participation in the actual alleged violations, especially when there is no evidence that Hoskins actually did sign any contracts on behalf of Ivy Capital.

The FTC has not and cannot demonstrate that mere ownership and status within the company equates to automatic individual liability.  In a case just recently decided in this District, *FTC v. Publishers Business Services, Inc., et al.*, 2011 WL 7462205 (D.Nev. July 25, 2011), for example, Judge Pro determined that the <u>president</u> and <u>owner</u> of a defendant telemarketing company was not individually liable even though she participated in administrative functions of the company, had authority to sign contracts and checks, and had power to bind the company. In fact, Judge Pro determined that four of the six named individual defendants—all of whom were immediate family members and employees or officers of the company—were not

20

1  individually liable for equitable monetary relief for any the violations at issue. *Id.*, 2011 WL

2  7462205 at *2. While that decision may not be binding upon this Court, it demonstrates the type

3  of inquiry that must be conducted into each individual's status.

4       In numerous other instances, a substantially higher degree of individual participation was

5  necessary before the court would consider imposing liability on an individual who had

6  connection with the business. In *FTC v. J.K. Publishing, Inc.*, 99 F.Supp.2d 1176 (C.D. Cal. 2000),

7  for example, the court granted a motion for summary judgment filed by Maurice O'Bannon, an

8  officer of the defendant company, because the FTC had insufficient evidence "on which a

9  reasonable jury could reasonably find for [the FTC]." *Id.* at 1208. Merely forming a corporation

10 and serving as a corporate officer and director (though those positions theoretically provided

11 authority to control the corporation's actions) were deemed insufficient, and O'Bannon was

12 dismissed. On the other hand, the wife of the primary defendant, Teresa Taves, was deemed to

13 be individually liable when she "'acted at the direction of someone she knew' had previously

14 run into trouble with the law" (her husband faced murder charges and numerous other criminal

15 investigations previously), when she set up bank accounts for him, signed numerous contracts,

16 and purchased a database of credit card numbers that were randomly charged in a fraudulent

17 scheme. When she was notified by the bank that an account was being closed because of

18 concerns over fraud, she went on to personally open new accounts to allow the scheme to go

19 forward. *Id.* at 1206-1207. It should also be noted, that *J.K. Publications* was decided in the

20 context of injunctive relief, where O'Bannon still prevailed under the lower "direct

21 participation" or "authority to control" standard. Had the court addressed monetary relief, the

22 outcome would have been even further assured.

23      Another example is *FTC v. Amy Travel*, 875 F.2d 564 (7th Cir. 1989), where the judge

24 determined that the individuals in question "designed and on a day-to-day basis oversaw the

25 sales operation." *Id.* at 574. They also wrote the deceptive sales script that was at the heart of the

26 claims against the defendants. *Id.* Thus, even though the individual did not make sales calls to

27 the company, they were directly involved in the conduct alleged to be unlawful, and they had

28

1   direct personal knowledge of the same.  No similar circumstances are present here, where the

2   best the FTC can come up with is Hoskins being one of numerous individuals—most of which

3   were not named as defendants in this action—who received financial and overall business

4   emails to update individuals on the financial picture of the company.

5          Though the FTC has tried to do so in this case, the Court cannot merely throw a net over

6   every individual who has an ownership interest or signing status for the company and hold

7   everyone who falls within the net to be automatically individually liable.  Such an approach

8   would not satisfy the individualized inquiry requirements, and would be especially

9   inappropriate in light of the massive monetary relief sought by the FTC here.

10         If the FTC has specific information to demonstrate Hoskins' individual involvement in the

11  actual practices alleged to violate the FTC Act or Telemarketing Sales Rule, it should have

12  provided it already.  It has failed to do so, instead pointing solely to Hoskins' involvement in

13  establishing business relationships for the entity and in providing financial backing during the

14  outset of the operation.  This is insufficient, and the FTC has no adequate evidence to support its

15  claims.

16  **IV.    CONCLUSION**

17         There is simply no factual basis to impose individual liability against Mr. Hoskins under

18  the applicable legal standards.  The evidence and undisputed facts show that he did not

19  participate in or have the authority to control the conduct at issue in this case, nor did he have

20  actual knowledge or recklessly indifference of the particular practices that the FTC claims were

21  improper in this case.  Hoskins is therefore entitled to summary judgment as a matter of law,

22  and summary judgment on the FTC's claims against him—including the claim for equitable

23  monetary relief—is appropriate.

24  Date: August 8, 2012                        **KOCH & SCOW LLC**

25                                              /s/ David R. Koch
                                                _____
26                                              David R. Koch
                                                Attorneys for Benjamin E. Hoskins, Leanne Hoskins,
27                                              Oxford Financial, LLC, and Dream Financial

28

## DECLARATION OF DAVID R. KOCH

I, David R. Koch, declare and state as follows:

1.      I am attorney of record for Ben Hoskins in this action.  I have personal knowledge of the facts stated herein and could testify competently thereto.  I make this declaration in support of Benjamin Hoskins' Motion for Summary Judgment.

2.      Attached hereto as Exhibit 2 is a true and correct copy of Plaintiff Federal Trade Commission's Objections and Responses to Defendant Benjamin E. Hoskins's First Set of Interrogatories, which we received in response to interrogatories served in this action.

3.      Attached hereto as Exhibits 3-11 are true and correct copies of relevant portions of the deposition transcripts of the following individuals whose depositions were taken in this case:

|   |   |   |
|---|---|---|
| a. | Exhibit 3: | Kyle Kirschbaum |
| b. | Exhibit 4: | Steven Lyman |
| c. | Exhibit 5: | John Harrison |
| d. | Exhibit 6: | Christopher Zelig |
| e. | Exhibit 7: | Kevin Woodward |
| f. | Exhibit 8: | James Hanchett |
| g. | Exhibit 9: | Josh Wickman |
| h. | Exhibit 10: | Michael Allen |
| i. | Exhibit 11: | Robert Payne |

4.      Attached hereto as Exhibit 12 is a true and correct copy of the Declaration of Robert Payne, which was previously submitted by the FTC as Exhibit 12 (part of Court Doc. #11) to their Ex Parte Emergency Motion for a Temporary Restraining Order and Other Equitable Relief (Court Doc. #6) in this action.

5.      Attached hereto as Exhibit 13 are true and correct copies of the Declarations of Holly Navarro, Renee Lightford, Randy Tuckett, and Jennifer Rodden, which were previously submitted by the FTC as Exhibits 13, 14, 15, and 20 to the Ex Parte Emergency Motion for a Temporary Restraining Order and Other Equitable Relief (Court Doc. #6) filed in this action.

1        6.     Attached as Exhibits 14, 15, 16, 17, and 18 are Declarations of Brian Fisher, Jeremey

2    Cheney, Jerry Kubicki, Jenny Coplin, and Jeremy Pike, respectively.

3

4        I hereby declare under penalty of perjury that the above statements are true and accurate.

5        Dated:  August 8, 2012                  /s/ David R. Koch

6                                                    David R. Koch

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28