David R. Koch (NV Bar No. 8830)
Daniel H. Stewart (NV Bar No. 11287)
KOCH & SCOW LLC
11500 S. Eastern Avenue, Suite 210
Henderson, NV 89052
Telephone:  (702) 318-5040
Facsimile:    (702) 318-5039

Attorneys for Benjamin E. Hoskins, Leanne Hoskins,
Oxford Financial, LLC, and Dream Financial

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>   Plaintiff,<br>v.<br><br>IVY CAPITAL, INC. et al.,<br><br>   Defendants, and<br><br>CHERRYTREE HOLDINGS, LLC, et al.,<br><br>   Relief Defendants | Case No.: 2:11-cv-00283-JCM-GWF<br><br>**RELIEF DEFENDANT<br>LEANNE HOSKINS' MOTION FOR<br>SUMMARY JUDGMENT**<br><br>[Declaration of Leanne Hoskins and<br>Benjamin E. Hoskins in Support thereof] |

Relief Defendant Leanne Hoskins ("Hoskins") hereby moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment against Plaintiff Federal Trade Commission's (FTC) claims to recover assets from her in the capacity of a Relief Defendant.[1]

This motion is made on the grounds that the FTC has neither discovered nor produced any evidence to support a claim that: (1) Leanne Hoskins received any "ill-gotten gains"; or (2) Leanne Hoskins did not have a legitimate claim to any funds that she may have received. The

---

[1] Leanne Hoskins' spouse, Ben Hoskins, from whom she is now legally separated, also has a Motion for Summary Judgment pending before this Court. Leanne Hoskins incorporates by reference the arguments that Ben Hoskins made in his Motion. To the extent that Leanne Hoskins's potential liability is solely derived from her husband's liability and he prevails on his Motion, she respectfully requests that this Court determine that she is also not liable for any monetary relief.

1

1 | undisputed facts show that the money Leanne Hoskins received from relief defendant Oxford
2 | Financial, LLC came from other legitimate sources that pre-dated Ivy Capital, were legitimate
3 | distributions for her ownership interest in the Oxford Financial, or were legitimate
4 | compensation payments for services she provided for Oxford Financial.
5 |     This motion is based on the following Memorandum of Points and Authorities, the papers
6 | and pleadings on file herein, the attached declarations of Leanne Hoskins and Ben Hoskins, and
7 | any oral argument that this Court may allow.
8 | Date: September 12, 2012        **KOCH & SCOW LLC**

/s/ David R. Koch
David R. Koch
Attorneys for Benjamin E. Hoskins, Leanne Hoskins,
Oxford Financial, LLC, and Dream Financial

## MEMORANDUM OF POINTS AND AUTHORITIES

I.  **INTRODUCTION**

Financially obliterating a defendant—especially a "relief defendant"—requires concrete proof, not inferences and speculation. Earlier in this case, Leanne Hoskins filed a Motion to Release Her Separate Property from Frozen Funds, which asked the Court to consider the source of the assets in her possession and to release pre-existing separate property not received from any entity involved in this action. (Doc. #246.) When ruling on the Motion, this Court found: "the parties dispute exactly how much money Mrs. Hoskins received from Ivy Capital, and what portion of those funds were proceeds of the alleged fraud and what portion constituted legitimate payments. Ongoing discovery will likely provide answers to these outstanding questions." (*See* Order Denying Motion to Release Separate Property, Doc.#252, at 2:17-20.) As anticipated by this Court, discovery proceeded on these issues, and information was produced shedding light on the questions left outstanding following the Court's Order. The evidence that has been derived demonstrates that Leanne Hoskins should not bear liability for the financially crippling claims that the FTC has brought against her.

To date, the FTC has not provided details demonstrating that Leanne Hoskins "has received ill gotten funds *and* that she does not have a legitimate claim to those funds." The Complaint contains no specifics, other than alleging that Leanne Hoskins, among numerous other Relief Defendants, "received, directly or indirectly, funds, other assets, or both, from Defendants that are traceable to funds obtained from Defendants' customers through the unlawful acts or practices described herein." (Doc. #1, ¶109.) The FTC has added little detail to the picture since filing the Complaint. For the FTC—which carries the burden of demonstrating both the ill-gotten nature of the assets and that the funds were not obtained in exchange for legitimate services or consideration—it is enough that Leanne Hoskins was married to defendant Ben Hoskins, and that she had an ownership interest in <u>another relief defendant</u> that received money from another defendant, Ivy Capital.

As demonstrated through discovery, however, Oxford Financial received the bulk of its revenues from numerous sources other than Ivy Capital. Oxford Financial was established in 1999, years before Ivy Capital was formed, as a vehicle for Ben Hoskins to provide consulting services to numerous businesses. It has received revenues from multiple clients, and payments from Ivy Capital were just a portion of the revenues received by Oxford Financial.

For her part, Leanne Hoskins had a legitimate claim to the funds she received. She was 51% owner of Oxford Financial of the company and provided consideration both through her partial ownership and by keeping the company's books and taxes, paying bills, and performing any administrative tasks that needed to be done. Courts in several similar factual scenarios have found that a spouse who provides "some services" for the entity that was the source of funds has a "legitimate claim" to her receipts.

In applying the Court's "broad, equitable powers," consideration should also be given to Leanne Hoskins' use of the funds that were received. Leanne and Ben Hoskins both have testified that Leanne received money from the Oxford Financial account to pay the family's day-to-day living expenses. Leanne Hoskins did all of the family banking through a joint family account, so all money paid for family expenses was given to her to pay for these expenses. No checks were written to Ben to pay for family living expenses. While the FTC has asserted without any evidentiary support whatsoever that Leanne must have "squandered" the funds she received through her ownership interest in Oxford Financial, the undisputed facts show that she used these funds for typical expenses of a family of six.

In sum, the FTC's case against Leanne Hoskins consists of the following argument: Oxford Financial received some money from Ivy Capital, and she received some money from Oxford. Under this inscrutable theory, every dollar Oxford Financial received was ill gotten and illegitimate, and every dollar that Oxford paid Leanne was therefore ill gotten and illegitimate. That is the sum total of the FTC's case against Leanne Hoskins, and the FTC's sole justification for seeking to strip away her home, her children's college funds, her previously received

inheritance, her separate property, and anything else she may own at this time. This Court, sitting in equity, should not condone such an approach, and Leanne Hoskins asks the Court to issue summary judgment in her favor with respect to Relief Defendant liability.

## II. STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 56-1, Leanne Hoskins provides the following statement of undisputed material facts in support of her Motion for Summary Judgment:

1. Oxford Financial, LLC was formed in 1999. (Leanne Hoskins Decl., ¶2.)

2. Leanne Hoskins has been a 51% owner of Oxford at all times relevant to this case. (*Id.*) Leanne Hoskins is a limited partner in Oxford, and Ben Hoskins is the general partner with sole power to make business decisions. (*Id.*)

3. Ben Hoskins provided consulting services to numerous businesses using Oxford Financial, LLC as the entity to provide these services. Compensation for Ben Hoskins' consulting services was paid to Oxford Financial. (B. Hoskins Decl., ¶¶2-3.)

4. Oxford Financial received money for consulting for companies such as Granite Energy, Mayan Gold, Ivy Capital, and numerous other clients from 1999 through 2011. (Ex. 1, 35:6-36:12; B. Hoskins Decl., ¶2.)

5. Oxford Financial was a "small family business," and Leanne Hoskins performed work for the business by keeping the company's books, preparing tax documents, paying taxes and bills, and performing any administrative tasks that needed to be done and that Ben Hoskins was unable to perform. (Ex. 1, 38:3-14; Ex. 2, 20:11-19; L. Hoskins Decl. ¶3.) Payments and distributions to Leanne Hoskins from Oxford Financial were reasonable and legitimate based upon her ownership interest and based on her work performed. (L. Hoskins Decl., ¶3; B. Hoskins Decl., ¶4.)

6. Leanne Hoskins used money she received from Oxford to pay household and family expenses. (Ex. 1, 114:14-17; 115:12-16; Ex. 2, 368:14-22; L. Hoskins Decl., ¶4.) Leanne Hoskins' right to use money from the Oxford account was due to her 51% ownership stake in the

company and her performance of services for the company, but she did not have authority to approve wire transfers or sign checks from the accounts. (Ex. 1, 41:21-42:9.).

7. Ivy Capital was formed in 2003, and Ben Hoskins was a part owner of the company. (Ex. 2, 46:18-23.) Ivy Capital's first distribution to the owners of the company was not made until 2007, according to Ivy's own records. (B. Hoskins Decl., ¶6.)

8. Total Oxford Financial revenues for 2007-2011 totaled $2,922,687.22. (B. Hoskins Decl., ¶7.) The Receiver has alleged that all payments from Ivy Capital to Ben Hoskins and Oxford Financial together, including salary and distributions, from 2006-2011 totaled no more than $1,138,911.20, which would overstate payments because this extends one year beyond the time frame relevant to this action. (Doc. #67, p. 21.)

9. Ben Hoskins directed all distributions and consulting fees owed to him from any source be sent to Oxford Financial. (Ex. 2, 363:11-21; B. Hoskins Decl., ¶3.)

10. Leanne Hoskins never received any direct payments from Ivy Capital or from any other Defendant in this case. (L. Hoskins Decl. ¶6.)

## III. LEGAL ARGUMENT

### A. Summary of Argument

The FTC has produced no evidence that could sustain its legal burden to prove that Leanne Hoskins received ill-gotten gains to which she had no legitimate claim. First, Ivy Capital was just one of the Ben Hoskins' clients to which he provided services through the Oxford Financial, LLC, and revenues from Ivy comprised only a portion of Oxford's revenues. Second, even if Oxford received any ill-gotten funds from Ivy Capital, Leanne Hoskins had a legitimate claim to the money that she received from Oxford Financial, as her ownership of Oxford and services provided a legitimate basis for the distributions. Finally, Leanne Hoskins used the portion of funds she received from Oxford Financial for family living expenses, and there is no reason to require disgorgement of such funds under equitable considerations.

B. **Legal Standards**

a. **The Standard For Obtaining Relief Against Relief Defendant**

In its Order denying Leanne Hoskins' Motion to Release Separate Property, the Court found that "'the broad equitable powers of the federal courts can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong.'" Order Doc.# 252, at 1:23-2:1 (quoting *S.E.C. v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998)). To justify this Court's broad equitable powers, though, the FTC bears the burden of showing that the relief defendant "'has received ill gotten funds *and* that he does not have a legitimate claim to those funds.'" *Id.* (Doc. #252, at 2:5-6 (quoting *Colello*, 139 F.3d at 677)); *FTC v. Bronson Partners, LLC, et al*, 674 F.Supp.2d 373, 392 (D. Conn. 2009). The Court must also give a relief defendant the opportunity to demonstrate "whether [s]he still possessed any of the funds" and "to show where the money went." *Colello*, 139 F.3d at 678.

b. **The Standard Of Review On A Motion For Summary Judgment**

"The purpose of summary judgment is to avoid unnecessary trials where there is no dispute as to the facts before the court." *Queen v. Hard Rock Hotel & Casino*, 2011 WL 6753011 *2 (D. Nev. Dec. 22, 2011). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Under the federal standard a moving defendant may shift the burden of producing evidence to the nonmoving plaintiff merely by 'showing' – that is, point out through argument, the absence of evidence to support plaintiff's claim." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 325).

In order to prevail on a summary judgment motion for lack of evidence, the party that does not bear the burden of proof on a particular issue at trial must "show that the nonmoving

party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A non-moving party that does not bear the burden at trial need only demonstrate the lack of a triable issue relating to *any* essential element of the non-movant's claim because "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. Summary judgment is appropriate when plaintiff's testimony is "largely unsubstantiated by any other direct evidence" and "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005) (internal citations omitted).

Because the FTC bears the burden of proof at trial, it must bring forth evidence demonstrating that Leanne Hoskins received ill-gotten gains to which she had no legitimate claim. To "baldly allege" her liability without a concrete basis in evidence or fact is not enough.

### C. Oxford Financial Was A Legitimate Business, And Leanne Hoskins Received Distributions For Her Ownership And Services Provided

The facts of this case as they relate to Leanne Hoskins are extraordinarily similar to facts of *FTC v. Direct Marketing Concepts, Inc.*, 648 F.Supp.2d 202 (D.Mass. 2009) *aff'd* 624 F.3d 1 (1st Cir. 2010), where the FTC sought disgorgement from a spouse who engaged in no wrongdoing. In *Direct Marketing*, the FTC alleged that the primary defendants violated the FTC Act in producing and disseminating two infomercials that purportedly misrepresented the products being sold. Numerous primary defendants were named along with relief defendant Lisa Mount, who was not only the spouse of a primary defendant but also the joint owner of two primary defendants named Triad and King Media. *Id.* at 222.

Mount worked full-time as the media director for King Media from 1992-1996, but then she remained home for several years to raise her children. *Id.* She performed limited work for King Media from late 2001 to early 2002, and she then received an S-Corp distribution of over $1.5 million <u>directly</u> from the <u>defendant</u> corporation. The FTC sought disgorgement of this

distribution from her as a relief defendant. The *Direct Marketing* court refused to require disgorgement from the spouse:

> The Court will not impose an order of disgorgement on relief defendant Lisa Mount. The evidence indicated that while Mount was married to Stern, **she was a shareholder** in Triad and King Media. The FTC relies exclusively on Triad's federal income tax return for 2002, which reports a subchapter-S **distribution of $1,545,305.00 to her. The bare fact of that distribution is not a sufficient basis to order her to disgorge that amount.** The evidence was that, while she had actively worked for King Media in the 1990s, **she performed only limited work, without payment,** for about six months in late 2001 and early 2002. There is **no evidence that she had any role in the production or placement of the Coral Calcium infomercial. The amount distributed may or may not have included proceeds of Coral Calcium sales. In short, there is an insufficient equitable basis for requiring her to forfeit a large sum which may have been a legitimate distribution.**

*F.T.C. v. Direct Marketing Concepts, Inc.*, 648 F.Supp.2d 202, 222-223 (D.Mass. 2009) *aff'd* 624 F.3d 1 (1st Cir. 2010) (emphasis added).

Remarkably similar circumstances exist here, but Leanne Hoskins' connection is even further removed. Leanne Hoskins is not an owner of any primary defendant in this case. (L. Hoskins Decl., ¶6.) Her only ownership interest is in another <u>relief</u> defendant, i.e., Oxford Financial. Like Lisa Mount, Leanne Hoskins performed "limited work" for Oxford Financial (*see* Ex. 1, 38:3-14; Ex. 2, 20:11-19), and she did not receive any direct wages for her services. Instead, like Lisa Mount, Leanne Hoskins was allocated end-of-year distributions from the LLC, which the FTC has claimed to total approximately $432,870.[2] (*See* FTC Opposition to Hoskins' Motion

---

[2] The FTC provided the non-expert Declaration of Thomas P. Van Wazer as an exhibit to the FTC Opposition to Hoskins's Motion to Release Her Separate Property. (*See* Opposition, Doc.#247-1.) The FTC never identified Mr. Van Wazer as an expert in this case, nor has he ever produced an expert report.

9

to Release Her Separate Property, Doc. #247-1, Declaration of Thomas P. Van Wazer, ¶6; attached to Declaration of L. Hoskins as Ex. 3.)

Oxford Financial derived its revenues through Ben Hoskins' consulting work for numerous companies, including Ivy Capital. (B. Hoskins Decl., ¶2.) During the relevant time period, Oxford Financial received $2,922,687.22 from numerous sources, only one of which was Ivy Capital. (B. Hoskins Decl., ¶7.) And just as in *Direct Marketing*, "the amount distributed [to Leanne Hoskins] may or may not have included proceeds of [the defendant company's] sales." As the majority owner and limited partner of Oxford Financial, Leanne Hoskins would receive regular distributions to compensate her for her investment and for the work she performed, and the amount distributed to Leanne Hoskins did not necessarily include any proceeds of Ivy Capital's sales. The FTC has not attempted to prove otherwise in this case.

Similar circumstances existed in *FTC v. Bronson Partners*, 674 F.Supp.2d 373 (D.Conn. 2009) *aff'd* 654 F.3d 359 (2nd Cir. 2011), where Martin Howard was accused of violating the FTC Act by selling diet teas and slim patches. The FTC named both Howard's company, H&H, and his wife Sandra as relief defendants because they received money from the operation at issue. As was the case here, the funds that H&H received were used by the Howards to pay personal expenses, such as mortgages, medical expenses, and household expenses. *Id*. In addition, Sandra Howard received separate compensation from H&H for her services. The court stated that a relief defendant could demonstrate a legitimate claim to funds received by showing that "some services" were performed in consideration for the monies. *Id*. at 392. And while Sandra Howard had no ownership interest in the entity, she did provide services for the fulfillment centers for the operation, including managing inventory and overseeing shipping and delivery matters. The court found that these services sufficed to give

---

Without waiving any objections to the admissibility of Mr. Van Wazer's Declaration as evidence, Leanne Hoskins points to the Declaration because it is the only time that the FTC has ever assigned an actual dollar amount to her liability. Mr. Van Mazer states that Leanne Hoskins received $432,870 from Relief Defendant Oxford Financial from 2007 to 2009—the relevant period in this dispute. (*Id*., Declaration, at ¶6.) The FTC has embraced this number ($432,870) as the measure of Leanne Hoskins' illegitimate and ill-gotten gains. (*Id*., 6:22-23.)

10

her a "legitimate claim" to the funds she received from the company, and held that she was not liable for any disgorgement. Applying these factors to Leanne Hoskins' relationship with Oxford Financial necessitates the same conclusion.

And in a final case where disgorgement was sought from a relief defendant, the Ninth Circuit drew a distinction between a party who "receive[s] compensation in return for services rendered," on the one hand, and "a mere puppet holding an account into which [the primary defendant] funneled its fraudulent earnings." *SEC v. Ross*, 504 F.2d 1130, 1142 (9th Cir. 2007). In the first scenario, the individual has "presumptive title to those commissions, and unless the Receiver can prove otherwise, it is likely that the Receiver can disgorge those commissions only by showing that [the Relief Defendant] has himself violated the securities laws." *Id.* at 1142. The latter "puppet" scenario is the paradigmatic relief defendant who serves only as a repository for tainted funds. And while both the FTC and the receiver appointed in this case have occasionally tried to help their case by hinting at allegations that Leanne Hoskins was somehow directly involved in the conduct at issue (claiming, for example that "Ms. Hoskins is not a mere bystander, who happened to have stumbled upon funds that happened to have emanated from unlawful conduct" (see Doc. #247 at 8:5-7)), the Court in *Ross* castigated such insinuations, explaining that such "equivocation…is both telling and fatal to [the Receiver's] claim." *Id.* at 1142. While the FTC in one breath has tried to tie Leanne Hoskins to the underlying conduct, it cannot equivocate by naming her a relief defendant. The FTC must either prove that she is a "puppet" or prove that she herself violated the laws at issue. In this case, it has done neither.

Simply put, despite the vast resources at its disposal, the FTC has no evidence to prove that Leanne Hoskins received ill-gotten gains to which she had no legitimate claim. She owned and worked for a legitimate, independent company that has been accused of no wrongdoing. Oxford Financial paid her based on her ownership interest and for the work that she performed, and those payments were based on the sum total of Oxford's revenues from all sources; they were never based entirely or even primarily on the funds received from Ivy Capital.

### D. Leanne Hoskins Used Funds From Oxford For Household And Family Expenses

A disgorgement remedy is equitable in nature, and equity requires the Court to exercise its discretion in determining the applicability of such a remedy. *S.E.C. v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993). In considering whether such a remedy should be issued, the Court has a responsibility "to do equity and to mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).

As explained in *Colello*, the district court may consider "where the money went" and "whether [the defendant] still possessed any of the funds" in determining the appropriateness of disgorgement. *Colello*, 139 F.3d 678. As has been repeatedly explained by both of the Hoskins, Leanne Hoskins used the funds she received from Oxford Financial primarily for household and family expenses. (Ex. 1, 114:14-17, 115:12-16, 122:5-14; Ex. 2, 368:14-22.) Ben Hoskins did not pay for any family expenses from the funds he received from Oxford Financial. (L. Hoskins Decl. ¶5; B. Hoskins Decl. ¶5.) Contrary to the FTC's repeated characterization of Leanne Hoskins' expenditures as "squandering" money (see Doc. #247 at 7:7-8), she has used the money to support her family and to pay for day-to-day living expenses. Though she graduated from law school years ago, she did not even take the bar exam until this year because her primary responsibility has been raising her four children. (Ex. 1, 11:18-12:2.) Thus, contrary to the FTC's portrayal of squandering self-indulgence, Leanne Hoskins' expenditures include rent, utilities, children's school tuition, health insurance, groceries, gas, medical bills, income and property taxes, auto insurance, clothing, etc.—in other words, the typical expenses of a family of six. (L. Hoskins Decl., ¶4.) Rather than splurge on luxury automobiles, for example, for five years Leanne Hoskins has driven a family-friendly Chevy Suburban purchased in 2007, and has not used any funds from the relevant time period to "squander" on a new vehicle. (*Id.* at ¶7.) Yet now when the Suburban is badly in need of repairs, the FTC has even refused to allow her to

12

trade it in for a more reliable car.[3] As a result, Leanne Hoskins had to rent a car to drive to see her family this summer because her current car is too unreliable to take on a road trip. (*Id.*)

When considering the equities of this case, the Court should consider whether there would even be a basis to name Leanne Hoskins as a relief defendant were it not for the intermediate relief defendant Oxford Financial being the recipient of funds as requested by Ben Hoskins. If Ben Hoskins had deposited his distributions from Ivy Capital and other clients straight into a joint checking account at Wells Fargo, for example, and Leanne wrote checks from their joint account to pay for school supplies and family dinners, would there be any basis whatsoever to claim she "received" ill-gotten gains? Leanne Hoskins is not aware of a single case where a wife is found liable for disgorgement as a relief defendant solely because her spouse deposited tainted funds into a joint account, and she unknowingly spent those funds in the typical course of daily family activities. Similar to "innocent spouse" relief in the context of income tax liability—which also requires the court to assess the inequity of holding the spouse liable for the other party's liability, *see Ordlock v. C.I.R.*, 533 F.2d 1136, 1139 (9th Cir. 2008)—there is no reason here to impose the drastic financial remedy the FTC is seeking solely because Leanne Hoskins used the Oxford Financial account to pay personal expenses rather than a joint checking account that would have served the same purpose.

### E. Leanne Hoskins' Sole Assets Consist of Separate Property As Has Now Been Decreed in Nevada Family Court

When Leanne Hoskins filed her Motion to Release Separate Property eight months ago (Doc. #246), she asked this Court to release her pre-existing separate property from the court-imposed asset freeze because such property could not possibly be derived from funds received by the primary defendants in this action. The Court determined that additional discovery might

---

[3] In May 2012, Leanne Hoskins requested the FTC's permission to trade in her Suburban, worth no more than $10,000, toward a replacement vehicle. The FTC refused to allow her to do so unless it was given a first lien on the new vehicle senior to any lender's lien, thus making it impossible for her to purchase any replacement vehicle, as no lender would agree to such a scenario.

shed light on the source of such property and the propriety of releasing the funds. (*See* Order, Doc.#252.)

Since that motion was decided, the Hoskins have been legally separated by a Decree of Separate Maintenance, filed with the Eighth Judicial District Court, Family Law Division. (Ex. 4.)[4] As stated in the Decree, the Court determined that most of the items in her prior Motion are in fact her sole and separate property. These assets comprise substantially all of the assets owned by Leanne Hoskins today.

Going back to this Court's statement at the March 2011 preliminary injunction hearing in this matter: "if you've got separate property assets, she can draw up a list of that and show it to the receiver and have him forward it to me and we'll review it and see, *but if somebody has genuinely separate property, for example, something she inherited and it doesn't require the expenditure of money, then that may be in a different category. I'm always willing to look at that.*" (Doc. #160, p. 27:8-16 (emphasis added).) There was good reason for the Court's inclination in this regard, as a relief defendant can only be liable if she "possesses ill-gotten gains derived from the unlawful acts or practices of the liable defendants, and has no legitimate claim to the property." *FTC v. Bronson Partners*, 674 F.Supp.2d at 392. In considering whether to award devastating financial remedies against Leanne Hoskins, the fact that the only assets she has remaining are her pre-existing separate property should factor into the Court's equitable calculus.

The Family Law Court found that the following assets were her sole and separate property:

1. Leanne's Chase account ending in 6008, which consists solely of funds gifted to her from family members;
2. Leanne's RBC brokerage account ending in 554, which contains gifts and distributions received from inheritance between 1997 and 2009;

---

[4] The parties and Court have approved the Decree of Separate Maintenance, and a file-stamped copy of the Decree will be submitted in a supplement in the next few days, once it is received. (L. Hoskins Decl., ¶8.)

14

3. A cashier's check received from her inheritance;

4. Her children's 529 college accounts for which she acts as custodian (this is not her separate property, but she will continue to hold the accounts for the children's benefit);

5. Leanne's right to reimbursement for the funds she invested in the family residence on 10 Drifting Shadow Way (which presently has little or no equity);

6. The vacant lot next to their family residence; and

7. Family heirlooms, gifts, and pre-marital property

(Ex. 4 at pp. 2-3.)

In considering the equities of imposing the extraordinary disgorgement relief sought by the FTC, the Court should recognize that while Leanne certainly did use community assets received from Ben while she raised her four children, (Ex. 1, 11:18-12:2), she otherwise could have been using her law degree to earn a separate living all the while preserving these same pre-existing separate property accounts. The fact that she has forgone such opportunities and instead used income from the "family business" that has been in operation since 1999 should not be held against her now. Leanne Hoskins has not "squandered" community funds in order to preserve these separate property assets, and the FTC has no factual or logical support for this untenable argument.

## IV. CONCLUSION

The undisputed facts show that Leanne Hoskins did not receive any ill-gotten gains to which she did not have a legitimate claim. She therefore respectfully requests this Court to grant her Motion for Summary Judgment by finding there to be no basis for relief defendant liability in this case.

Date: September 12, 2012                KOCH & SCOW LLC

/s/ David R. Koch
David R. Koch
Attorneys for Benjamin E. Hoskins, Leanne Hoskins, Oxford Financial, LLC, and Dream Financial

## DECLARATION OF LEANNE HOSKINS

I, Leanne Hoskins, declare and state as follows:

1. I am over the age of 18, and I have personal knowledge of the facts stated herein and could testify competently thereto. I have been named as relief defendant in this action, and I make this declaration in support of my Motion for Summary Judgment.

2. Oxford Financial, LLC was formed in 1999. I have been a 51% owner of Oxford at all times relevant to this case. I am a limited partner in Oxford, and Ben Hoskins is the general partner with sole power to make business decisions. I had no signatory power on Oxford's bank account, and all checks needed to be signed by Ben.

3. Oxford Financial was a small family business that Ben used to provide consulting services to numerous clients. I did not regularly discuss the consulting work Ben was providing for clients, and I performed general work for Oxford by keeping the company's books, preparing tax documents, paying taxes and bills, and performing any administrative tasks that needed to be done. I believe the payments and distributions I received from Oxford Financial were reasonable and legitimate based upon my ownership interest and the work I performed.

4. When I received money from Oxford, it went into a joint family account to be used for family expenses such as include rent, utilities, children's school tuition, health insurance, groceries, gas, medical bills, income and property taxes, auto insurance, clothing, etc.—in other words, the typical expenses of a family of six.

5. Ben did not pay for any family expenses from the funds he received from Oxford Financial.

6. I never received any direct payments from Ivy Capital or from any other Defendant in this case. I do not have any ownership interest in any primary defendant in this case.

7. For five years I have driven a Chevy Suburban purchased in 2007, which is a vehicle I purchased for our family. I have not used any funds from the FTC's time period to

purchase a new vehicle. The Suburban is badly in need of repairs, but the FTC has refused to allow me to trade in the Suburban for a more reliable car. As a result, I had to rent a car to drive to see my family this summer because the Suburban is too unreliable to take on a road trip.

8. Ben and I have been legally separated by a Decree of Separate Maintenance, which has been filed with the Family Law Division. A true and correct copy of the Decree is attached as Exhibit 4. The Decree has been approved by both sides and by the judge, and we are presently waiting for the executed Decree to be returned by the judge. Once we receive it, we will file a supplement to this Declaration. As stated in the Decree, the Court determined that most of the items in my prior Motion are my sole and separate property. These assets comprise substantially all of the assets I own today.

9. While I used community assets received from Ben while I raised our children, had I not used this income, I otherwise could have been using my law degree to earn a separate living while preserving my separate property. I have not attempted to "squander" community funds in order to preserve these separate property assets.

10. Attached hereto as Exhibit 1 is a true and correct copy of the relevant portions of my deposition transcript in this case.

11. Attached hereto as Exhibit 3 is a true and correct copy of the Declaration of Thomas P. Van Wazer that the FTC submitted in response to my Motion to Release Separate Property earlier in this case.

I hereby declare under penalty of perjury that the above statements are true and accurate.

Dated: September 12, 2012                         /s/ Leanne Hoskins
                                                  Leanne Hoskins

## DECLARATION OF BENJAMIN E. HOSKINS

I, Benjamin E. Hoskins, declare and state as follows:

1. I am over the age of 18, and I have personal knowledge of the facts stated herein and could testify competently thereto. I have been named as defendant in this action, and I make this declaration in support of Leanne Hoskins' Motion for Summary Judgment.

2. Leanne and I form Oxford Financial, LLC in 1999. I am the general partner of Oxford, and it was established as the business entity that I used to provide consulting services to numerous clients since 1999. Oxford Financial received money for consulting with numerous companies, such as Granite Energy, Mayan Gold, Ivy Capital, and numerous other clients from 1999 through 2011.

3. Compensation that I received, whether in the form of distributions or consulting fees, was deposited into the Oxford account at my direction.

4. Leanne received distributions from Oxford as part of her ownership interest in the company and on account of the administrative services she provided for Oxford. These included keeping the company's books, preparing tax documents, paying taxes and bills, and performing any administrative tasks that needed to be done. I believe the payments and distributions Leanne received from Oxford Financial were reasonable and legitimate.

5. Leanne was responsible for handling payment of all family expenses. She would receive money from Oxford and deposit it into a joint family account that would pay expenses such as groceries, insurance, medical bills, and taxes. I did not pay for any family expenses from the funds I received from Oxford Financial.

6. Ivy Capital was formed in 2003, and I was a part owner of the company from the start. The owners did not receive any distributions from Ivy Capital until 2007, and this is reflected in the company's own records.

7. From 2007 through 2011, Oxford Financial, LLC had total revenues of at least $2,922,687.22. Only a portion of these revenues came from Ivy Capital, as I am aware that the

Receiver has alleged that the sum total of all payments in the form of distributions and salary paid either to me or to Oxford Financial from 2006 to 2011 was no more than $1,138,911.20.

8. Attached hereto as Exhibit 2 is a true and correct copy of the relevant portions of my deposition transcript in this case.

I hereby declare under penalty of perjury that the above statements are true and accurate.

Dated: September 12, 2012                         /s/ Benjamin E. Hoskins
                                                  Benjamin E. Hoskins

# CERTIFICATE OF SERVICE

Pursuant to NRCP 5(b), I certify that on September 12, 2012, I caused the following documents entitled: **RELIEF DEFENDANT LEANNE HOSKINS' MOTION FOR SUMMARY JUDGMENT** to be served by electronic filing to all counsel of record in this action.

I declare under penalty of perjury that the above is true and correct.

Executed on September 12, 2012, at Henderson, Nevada.

                                  /s/    David R. Koch
                                        David R. Koch