1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

7   FEDERAL TRADE COMMISSION,                2:11-CV-283 JCM (GWF)

8                    Plaintiff,

9   v.

10  IVY CAPITAL, INC., et al.,

11                   Defendants.

12

13                              **ORDER**

14      Presently before the court is defendant Benjamin E. Hoskins' motion for summary judgment.

15  (Doc. # 312).  Defendant Benjamin E. Hoskins filed a reply to his own motion.  (Doc. # 386).[1]

16      Also before the court is relief defendant Leanne Hoskins' motion for summary judgment.

17  (Doc. # 320).  Plaintiff Federal Trade Commission ("FTC") filed a response in opposition (doc. #

18  364), and relief defendant Leanne Hoskins filed a reply (doc. # 385).

19      Also before the court is the FTC's motion for summary judgment.  (Doc. # 323).[2]  Relief

20  defendants Leanne Hoskins, Oxford Financial, LLC, and Mowab, Inc. filed a response in opposition

21

22      [1] The would be response by plaintiff Federal Trade Commission was encompassed by its own
    motion for summary judgment (doc. # 323), and other filings in conjunction with the summary
23  judgment motion.

24      [2] Relief defendants Leanne Hoskins, Mowab, Inc., and Oxford Financial, LLC filed an
    objection to the declaration of Andrew Chen.  (Doc. # 366).  The FTC filed a response in opposition
25  (doc. # 383), and the relief defendants filed a reply (doc. # 387).   The declaration of Andrew Chen
    was one of the exhibits to the FTC's summary judgment motion.  (*See* doc. # 323).  Andrew Chen
26  was the contact person for Visa.  The court finds that the FTC properly disclosed Visa as an entity
    that might have discoverable information.  Visa just happened to provide Andrew Chen on its behalf.
27  The FTC properly complied with Federal Rule of Civil Procedure 26(g)(1)(A).
28

James C. Mahan
U.S. District Judge

1  (doc. # 367), and the FTC filed a reply (doc. # 382).  Defendants Benjamin Hoskins and Dream

2  Financial also filed a response in opposition (doc. # 368), and the FTC filed a reply (doc. # 384).

3         As an initial matter, the majority of the individual, corporate, and relief defendants in this

4  case have already settled with the FTC.  The court has approved these settlements.  (*See* docs. # 369-

5  78).  Specifically, all of the following defendants have settled with the FTC: (1) individual

6  defendants Kyle G. Kirschbaum, John H. Harrison, Steven E. Lyman, Christopher M. Zelig, Steven

7  J. Sonnenberg, James G. Hanchett, and Joshua F. Wickman; (2) corporate defendants Ivy Capital,

8  Inc., Fortune Learning System, LLC, Vianet, Inc., 3 Day MBA, LLC, Global Finance Group, LLC,

9  Virtual Profit LLC, ICI Development, Inc., Ivy Capital, LLC, Logic Solutions, LLC, Oxford Debt

10  Holdings, LLC, Revsynergy, LLC, Sell It Vizions, LLC, Zyzac Commerce Solutions, Inc., Fortune

11  Learning, LLC, The Shipper, LLC, D/B/A Wholesalematch.com, and Enrich Wealth Group, LLC;

12  and, (3) relief defendants Cherrytree Holdings, LLC, S&T Time, LLC, Virtucon, LLC, Curva, LLC,

13  Kierston Kirschbaum, Melyna Harrison, and Tracy Lyman.

14         The FTC has filed its summary judgment motion against the only remaining parties, the ones

15  that did not settle the claims against them.  The remaining defendants are Benjamin Hoskins and

16  Dream Financial.  The FTC seeks injunctive and equitable monetary relief from both of these

17  defendants.  The FTC's motion for summary judgment also includes relief defendants Leanne

18  Hoskins, Oxford Financial, LLC ("Oxford Financial"), and Mowab, Inc. ("Mowab").  The FTC seeks

19  disgorgement from these parties as relief defendants.

20  **I.     Background**

21         The Ivy Capital enterprise consisted of an interconnected web of 22 companies, including

22  Dream Financial, in Nevada, California, and Utah.  These companies were run primarily by Mr.

23  Hoskins and seven other owners.  Proceeds from the scam were distributed among these owners

24  either directly or through LLCs owned by certain owners and/or their spouses.

25         Mr. Hoskins met his three initial partners in the Ivy Capital enterprise through Terry Lyman,

26  who is married to Mr. Hoskins' cousin.  In 2003, Terry Lyman informed Mr. Hoskins that Kyle

27  Kirschbaum, John Harrison, and Steven Lyman (brother of Terry) were interested in starting a

28

**James C. Mahan**
**U.S. District Judge**

1  company.  Mr. Hoskins had the experience to help the group get started.  He had previously worked

2  in investment banking and in sales for a company that sold web sites.

3  After the meeting the three partners all moved to Las Vegas and decided to go into business

4  together through Ivy Capital, Inc., a company Mr. Hoskins named.  Mr. Hoskins provided basic start-

5  up resources and a lead source.  He was granted a 40% stake in the company.  Around 2009, the four

6  became equal partners.  The four also shared equal ownership interest in most of the other entities

7  throughout the larger Ivy Capital enterprise.  Mr. Hoskins regularly participated in the Ivy Capital

8  management meetings and was treated as a senior manager.  He was either an officer or managing

9  member of several of the Ivy Capital entities.

10  Mr. Hoskins and the other defendants were engaged in a complex scheme designed to cheat

11  consumers out of millions of dollars through a bogus business coaching program and a variety of

12  useless goods and services as add-ons to the program ("upsell products and services").  The scheme

13  played out in four stages over a relatively short period of time.

14  First, defendants identified consumers who were duped by the enterprise's misleading web

15  sites touting unrelated work-from-home programs and soliciting consumers' contact information on

16  those sites.  Second, defendants' telemarketers called consumers who provided contact information

17  to the lead generators and convinced them to purchase a much more expensive business coaching

18  program that they claimed would help consumers start their own successful internet businesses.

19  During those sales calls, defendants' telemarketers made numerous false claims regarding the income

20  consumers could expect from following the program.

21  Third, shortly after consumers purchased the business coaching program, defendants'

22  telemarketers contacted consumers and marketed numerous upsell products and services that they

23  claimed were essential for an internet business.  Fourth, defendants enforced a strict three-day refund

24  policy, but frequently failed to disclose that policy to consumers or denied refunds even to consumers

25  who attempted to cancel within the three-day period.

26  A.      Stage One - Locating the Lead

27  The Ivy Capital scheme began with lead generation.  Leads were identified when consumers

28

James C. Mahan
U.S. District Judge

- 3 -

provided contact information in response to email blasts, promotional web sites, or internet advertisements produced by an extensive network of companies and entities that functioned as lead generators.

Most of the lead generators for the Ivy Capital enterprise touted some type of purportedly lucrative work-from-home program that typically cost between $50 and $250. However, the programs did not appear to be affiliated with the Ivy Capital enterprise. The ads, emails, and web sites promised people that if you followed the program, you could make hundreds, if not thousands, of dollars per week. Their contact information wound up in the hands of the Ivy Capital enterprise.

In response to lead generators, consumers had no reason to suspect that they were providing their information to the Ivy Capital enterprise. The Ivy Capital enterprise received its lead generations in part from its own entities and in part from purchasing the information from unrelated companies.

B.    *Stage Two - Telemarketers Sold the Business Coaching Program*

Telemarketers received the customers' personal information from the lead generators. Telemarketers then made outbound calls to attempt to convince consumers to spend thousands of dollars on a personal business coaching program (the "business coaching program"). Sales representatives promised consumers that by following the business coaching program, consumers would have their own internet businesses that would generate substantial income with little effort. As part of the business coaching program, a consumer would get specialized assistance from a coach.

In the overwhelming majority of calls, the telemarketers made numerous express and implied claims about what consumers could expect to receive and achieve through the business coaching program. The telemarketers used company approved scripts. In the scripts, telemarketers made a series of misrepresentations about the products and services that defendants would provide, and the income consumers could earn by following the program.

The initial call often lasted for more than an hour. The telemarketers stated that the consumer was personally selected and that the business coaching program would show them how to make major profits. The telemarketers stated that the consumers would be provided with personal coaches

**James C. Mahan**
**U.S. District Judge**

that could provide them with the requisite knowledge and skills and walk them step by step through the program. Telemarketers further guaranteed that if consumers were willing to spend as little as five to ten hours per week and committed to following the program, they would be successful.

Telemarketers introduced the idea of making a one time, short term investment to pay for the cost of the business coaching program. Consumers were encouraged to use credit cards to make the payment. Telemarketers represented that consumers would not actually be paying anything for the start up cost because they would make money so quickly that they could immediately pay back the credit charge. Finally, the telemarketers introduced the company's "warranty" or "guarantee" that consumers would make back their entire investment in six months or the company would continue working with them until they recouped their investment.

If the consumer did not immediately commit, then a "supervisor" or director" would call back the lead and repeat all the same guarantees. Consumers were guaranteed they would receive everything they needed to start their own successful online business including: weekly coaching sessions with experts who knew how to make money online; unlimited access to training videos and material online; and, technical assistance for building a unique web site for their future businesses. The program's price varied wildly–anywhere from $2,000 to over $20,000.

Telemarketers spun tales of prior consumers that made $3,000 in the first week or would generate $100,000 per year. Some even stated that a million dollars would be possible within the first month.

C.    Stage Three - Upsell Products and Services

After a consumer purchased the business coaching program, defendants targeted purchasers of the business coaching program for a host of upsell products and services. Consumers were barraged with the additional telemarketing pitches.

The Ivy Capital enterprise operated units that purported to offer specialized services that would help a consumer's online business succeed. Two example units were called the Business Development Division ("BDD") and the Tax Planning Division ("TPD"). These divisions provided "guidance" in establishing and naming an LLC as well as implementing a tax strategy. These

James C. Mahan
U.S. District Judge

- 5 -

services provided basic knowledge and charged substantial amounts for the services.

The Ivy Capital enterprise also provided such upsell products and services as credit repair services, MBAs, and software for orders and shipment.  Each service or product provided little, if any, meaningful benefit.

Consumers rarely developed actual internet businesses that could benefit from these services. Moreover, even if a consumer did manage to start an internet business, the upsell products and services fell far short of what telemarketers promised.

Some flaws with the upsell products and services included: BDD made it difficult for consumers to contact their coaches; coaches stopped working with their consumers after only a few weeks; BBD never completed all the steps necessary to ensure that consumers' business would be eligible for corporate credit; BDD made assurances that its legal department could handle certain issues but it did not even have a legal department; TPD had no basis for claims of tax deductions or credits; TPD employed no tax experts in its tax department; TPD promised review of consumers' last two years of personal tax returns never happened, and, if pressed for a response, TPD simply provided a letter stating (falsely) that a review was conduct but no mistakes were identified. Essentially, customers received little or no help.

D.    *Stage Four - Deceptive Refund Practices*

Many consumers, after good faith efforts at trying to establish a successful internet business using defendants' plan and services, became dissatisfied and sought refunds from the Ivy Capital enterprise.  Defendants engaged in a variety of deceptive strategies designed to stymie consumers' efforts to receive refunds and voice legitimate complaints.

Defendants had a strict three-day refund policy.  Most of the consumers were not told prior to purchasing defendants' programs or services that they had to cancel within three days to be eligible for a refund.  Defendants actively instructed their telemarketers to omit information about the refund policy.  If consumers did ask about the refund policy, the policy was to pressure consumers to sign the contract before consumers had an opportunity to read and learn about the policy.

After substantial complaints by consumers that they were never even informed of the three-day return policy, defendants began using a compliance officer in each sales call that informed consumers they would be entitled to a refund only if they sought a refund within the three-day window.  Even when consumers did seek a refund within the prescribed period, defendants created substantial obstacles for anyone seeking a refund.

The first obstacle was trying to speak with a representative at all.  The phone numbers provided to consumers to seek a refund were unconnected, no one answered, or voice mail boxes were full or inactive.  Even if they could leave a message, on one returned the call within the three-day window, if ever.

Even if consumers were able to get through to a representative of the "Resolutions Department," those representatives were not at all helpful.  They rarely resolved anything in favor of the consumer.  Representatives resorted to threats and intimidation.

The final obstacle was the non-disparagement agreement.  If a customer was persistent enough to garner a refund, defendants made the consumer sign a non-disparagement agreement, paramount to a gag order, as a precondition for refunds.  Under the terms of the gag order, consumers had to state "that they will not provide information, make any statement orally or in writing, or take any action, directly or indirectly, that would cause [the Ivy Capital enterprise] embarrassment or humiliation or that could reasonably be interpreted to be disparaging of [the Ivy Capital enterprise]." Consumers had to agree to liquidated damages in the amount of $1,000 for each breach of the agreement.

E.    *Other Behavior*

Defendants' telemarketers also made unsolicited calls to people who listed their telephone numbers on the national "Do Not Call" registry ("DNC registry").  Defendants' telemarketers made over 10,000 calls to consumers on the list.  Defendants made no attempt to avoid calling numbers on the DNC registry and never paid the annual fee necessary to access the list of numbers on the DNC registry.

James C. Mahan
U.S. District Judge

1

*F.      Lack of Results*

None of the services offered by defendants provided any real benefit.  Defendants have not offered one person who started a successful online business after using any of their products or services.  Defendants have not even provided the name of any consumer who recouped their initial investment, much less made any profit.  The services, coaching, and products sold by defendants amounted to nothing more than simple common sense that any person could find and learn through elementary research on their own.  Defendants provided no meaningful assistance in starting an online business.

**II.    Legal Standard**

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways:  (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider

**James C. Mahan**
**U.S. District Judge**

- 8 -

1   the nonmoving party's evidence.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

2       If the moving party satisfies its initial burden, the burden then shifts to the opposing party

3   to establish that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith*

4   *Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing

5   party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

6   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions

7   of the truth at trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th

8   Cir. 1987).

9       In other words, the nonmoving party cannot avoid summary judgment by relying solely on

10  conclusory allegations that are unsupported by factual data.  *See Taylor v. List*, 880 F.2d 1040, 1045

11  (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the

12  pleadings and set forth specific facts by producing competent evidence that shows a genuine issue

13  for trial.  *See Celotex Corp.*, 477 U.S. at 324; *see also FTC v. Publ'g Clearing House, Inc.*, 104 F.3d

14  1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any

15  supporting evidence, is insufficient to create genuine issue of material fact.").

16      At summary judgment, a court's function is not to weigh the evidence and determine the

17  truth, but to determine whether there is a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*,

18  477 U.S. 242, 249 (1986).  The evidence of the nonmovant is "to be believed, and all justifiable

19  inferences are to be drawn in his favor."  *Id.* at 255.  But if the evidence of the nonmoving party is

20  merely colorable or is not significantly probative, summary judgment may be granted.  *See id.* at

21  249–50.

22  **III.    The Ivy Capital Enterprise**

23      The FTC filed a ten-count complaint.  (*See* doc. # 1).  Counts one through four allege

24  violations of section 5(a) of the Federal Trade Commission Act ("FTC Act"), which prohibits "unfair

25  or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a).  Counts five through

26  nine allege violations of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. part 310, which prohibits

27  deceptive telemarketing acts or practices and other abusive telemarketing acts or practices.  Finally,

28

James C. Mahan
U.S. District Judge

1    count ten alleges that the relief defendants received ill-gotten gains from the fraudulent scheme and

2    must disgorge those assets.

3         The court will discuss the governing law and each cause of action in turn.  Ultimately, the

4    court concludes that the defendants are liable for their deceptive and unfair conduct.  The court

5    grants injunctive and monetary relief in favor of FTC and against the defendants.  The court further

6    finds that the relief defendants received ill-gotten gains and must disgorge those assets.  The FTC

7    has provided a mountain of properly authenticated evidence in support of its arguments and summary

8    judgment motions.  All defendants, including the relief defendants, provide little more than

9    unpersuasive self-serving declarations in support of their arguments.  *See FTC v. Publ'g Clearing*

10   *House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking

11   detailed facts and any supporting evidence, is insufficient to create genuine issue of material fact.").

12        *A.    Counts One Through Four, Violations of the Federal Trade Commission Act*

13        Counts one through four allege violations section 5(a) of the FTC Act against Benjamin

14   Hoskins and Dream Financial, amongst other defendants that have already settled.

15        "Section 5 of the Federal Trade Commission Act prohibits 'deceptive acts or practices in or

16   affecting commerce.'"  *FTC v. Cyberspace.com, LLC*, 453 F.3d 196, 1199 (9th Cir. 2006) (quoting

17   FTCA § 5(a)(1), 15 U.S.C. § 45(a)).  To establish a section 5(a) violation, the FTC must show a

18   practice that: (1) "is likely to mislead consumers acting reasonably under the circumstances," and

19   (2) " in a way that is material."  *FTC v. Grant Connect, LLC* , 827 F.Supp.2d 1199, 1214 (quoting

20   *Cyberspace.com*, 453 F.3d at 1199 (9th Cir. 2006)).  "The representation may be either implied or

21   express."  *FTC v. Publishers Bus. Servs., Inc.*, 821 F.Supp.2d 1205, 1223 (citing *FTC v. Figgie Int'l*

22   *Inc.*, 994 F.2d 595, 604 (9th Cir. 1993)) ([N]othing in statute or case law [ ] protects from liability

23   those who merely imply their deceptive claims; there is no such loophole.").

24        "To determine whether a representation, omission, or practice is likely to mislead, the court

25   considers the overall net impression the representation creates."  *Id.*; *FTC v. Stefanchik*, 559 F.3d

26   924, 928 (9th Cir. 2009) ("Deception may be found based on the 'net impression' created by a

27   representation.").  "Thus, a representation may amount to a Section 5 violation where the

28

**James C. Mahan**
**U.S. District Judge**                                    - 10 -

representation is literally true, if the overall net impression is likely to mislead." *Id.* (citing *Cyberspace.com*, 453 F.3d at 1200). "Making disclosures in fine print may not overcome an advertisement's deceptive net impression." *Grant Connect*, 827 F.Supp.2d at 1214 (citing *Cyberspace.com*, 453 F.3d at 1200-01 (holding fine print notices on reverse side of check did not overcome net impression that check was a refund or rebate when the fine print stated that cashing the check would result in a monthly fee for internet access)). "A defendant violates the Act if its advertisement 'induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract.'" *Id.* (quoting *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975)). Consumer claims on express claims is presumptively reasonable.

A representation, omission, or practice "is material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Cyberspace.com*, 453 F.3d at 1201. "Express claims or deliberately-made implied claims used to induce the purchase of a particular product or service are presumed to be material." *FTC v. SlimAmerica, Inc.*, 77 F.Supp.2d 1263, 1272 (S.D. Fla. 1999) (citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994)). If consumers are likely to have chosen differently, but for the deception, then a misrepresentation is material. *In re matter of Southwest Sunsites, Inc.*, et al, 105 F.T.C. 7, 149-50 (FTC 1985).

       i.      Count 1

Count one alleges that the defendants' representations that consumers were likely to earn thousands of dollars per month after purchasing the business coaching program was false and misleading. Count one also alleges that defendants' claim that within six months purchasers' internet businesses would generate at least the full cost of the business coaching program was false and misleading.

Courts have long held that unsubstantiated claims of high potential earnings, even without specific figures, are deceptive under the act. *See, e.g., FTC v. Tashima*, 318 F.3d 1273, 1277-78 (11th Cir. 2003).

1     In the undisputed facts in this case, defendants' sales representatives repeatedly used
2  unsubstantiated and false earnings claims to entice consumers into purchasing the enterprise's
3  business coaching program.  Representatives informed consumers that prior purchasers had made
4  thousands of dollars per month within only a few weeks of using the business coaching program and
5  that consumers could expect to earn back their entire investment within six months or less.
6  Consumers were told it was easy to make thousands of dollars and that they should aim high.
7  Hundreds of consumer complaints, sales scripts, and recorded sales calls from the defendants'
8  premises all demonstrate these deceptive earnings claims.  These deceptive claims were made in the
9  vast majority of telemarketing calls.  Most consumers who purchased the business coaching program
10  lost every penny of their investment, plus all the interest they paid for the charges on their credit
11  cards.

12     The Ivy Capital enterprise used testimonials from "successful" customers.  The testimonials
13  of success from using the Ivy Capital enterprise programs, products, and services were wildly
14  deceiving.  Several of defendants' employees testified that a "success story" included virtually
15  anyone who sold anything on eBay for any amount.  Defendants testified they conducted no follow
16  up research to determine if any of the consumers who featured in company wide emails, promotional
17  materials, and newsletters earned back their initial investments, established a lucrative internet
18  business, or whether the consumer earned any sort of profit.

19     In conclusion, the FTC has provided a mountain of evidence that defendants' representations
20  about the amount that a purchaser could earn, and how quickly a purchaser could earn a profit, was
21  false and misleading.  *See, e.g., Stefanchick*, 559 F.3d at 928-29 (holding program that asserted
22  consumers would make lots of money in small amount of time by brokering privately held mortgages
23  was deceptively advertised where program was promoted as "easiest way to make $10,000 every 30
24  days . . . guaranteed," yet owner had no substantiation for earnings claims and evidence showed
25  consumers made little to nothing).  Indeed, defendants have not identified a single purchaser who
26  achieved the represented earnings or recouped his or her initial investment.  Defendants committed
27  the FTC Act violations in count one.

28

**James C. Mahan**
**U.S. District Judge**

ii.     Count Two

Count two alleges that defendants violated the FTC Act by making false, misleading and deceptive representations concerning products and services offered to consumers upon purchase of the business coaching program.

The sale of services that have no reasonable prospect of achieving the results claimed is deceptive.  The undisputed evidence shows that defendants marketed and sold a business coaching program that had no reasonable prospect of achieving the results claimed.

Defendants told consumers they would receive coaching from experts who themselves had their own profitable internet businesses.  These were false claims.  Defendants' coaches could not be considered experts under any set of circumstances.  Most of the coaches had never established their own successful online business.  At the time this court issued its preliminary injunction, defendants were not only unaware of the "coaches" they employed, but also did not have any information that any of the coaches had established a successful online business.

The coaches did not have any formal education, were not required to complete defendants' own business coaching program, and were not required to have any specialized training.  It appears that the most that any "coaching expert" actually taught a consumer was how to sell something on eBay–something a consumer could have researched online and learned themselves without having to spend thousands of dollars on the business coaching program.  Many consumers complained about the lack of knowledge of their coaches and defendants were aware of this concern.

Simply, defendants misrepresented the quality of their coaches and what the coaches could provide.  Consumers would not have spent upward of $20,000 on coaching services if they had known that: (1) success meant selling one thing on eBay; (2) the curriculum was developed by using readily available online resources; and (3) the defendants' sales representatives grossly misrepresented the quality of the coaches.[3]

---

[3] In a particularly illustrative example of the total failure of the defendants' coaches and products to facilitate the start up and success of an online business–one consumer testified that after spending over $7,000 on "upsell" products alone, he sold three items on eBay.  One was a legit sale that did not nearly earn back his investment.  The other two items the consumer bought from his own

1    Additionally, telemarketers made other misrepresentations about defendants' products and

2    services. Defendants promised consumers they would provide the consumers with a variety of goods

3    and services that would help an online business start and then thrive.  These goods and services

4    included: (1) a credible web site that would get to the first or second page of the top 220 search

5    engines in the world; (2) an autoresponder that would allow a consumer to make money in their

6    sleep; (3) merchant accounts; and, (4) access to digital products or physical products to sell.  These

7    tools were all flawed.

8    Additionally, the "Virtual Learning Center" was a resource sold by the Ivy Capital enterprise

9    to consumers that was supposed to give online tutorials in all facets of starting an online business.

10   It experienced significant technical difficulties.  Defendants would not respond to calls or emails

11   from consumers to inform them of difficulties of the Virtual Learning Center or any other service

12   or product provided.

13   In summary, defendants failed to deliver on their promise–successful, profitable internet

14   businesses that would enable consumers to make substantial incomes working from home.  None

15   of the products marketed and sold, especially the business coaching services, provided purchasers

16   the skills or knowledge necessary to run an online businesses.  Defendants committed the FTC Act

17   violations in count two.

18                    iii.    Count Three

19   Count three alleges that in numerous instances defendants failed to disclose to consumers

20   material aspects of their refund policy.  Specifically, defendants failed to disclose that: (a) consumers

21   had to request a refund within three days of purchase; and/or (b) consumers had to sign a non-

22   disparagement agreement in order to received a refund.

23   The failure to disclose facts that could have affected consumers' decisions, i.e., the condition

24   for obtaining refunds is deceptive.

25   Defendants had a strict three-day cancellation policy for their programs, products and

26   services.  Defendant telemarketers frequently failed to disclose this policy to consumers prior to

27   ─────────────────────

28   website just to confirm his own website was working.

**James C. Mahan**
**U.S. District Judge**

purchase. Refunds were discussed in only 17% of calls (based on a statistical sampling). Defendants had a written policy against disclosing the refund policy. The policy was absent from scripts used by telemarketers. Further, it was an enterprise wide policy to pressure consumers to sign the contract before they had an opportunity to read the disclosures.

Even if consumers, after a considerable amount of diligence and persistence, were able to obtain any kind of refund, the refund was conditioned on a consumer's willingness to sign a non-disparagement agreement. The non-disparagement agreement was essentially a gag order.

The failure to disclose the three-day policy or non-disparagement agreement at the outset was a deceptive practice under section 5(a).

iv.      Count Four

Count four alleges that in numerous instances defendants made misrepresentations regarding their refund policy. In particular, defendants falsely represented that they would provide refunds to dissatisfied consumers who cancelled within three days. However, even in situations where the refund policy was adequately disclosed, defendants failed to provide refunds to consumers who requested them within three days.

The Ivy Capital enterprise was very strict on giving refunds. Even if a consumer tried to obtain a refund, they were first referred back to their sales representative instead of anyone who could actually help them receive a refund. The sales person would try to convince the consumer not to cancel.

Consumers calls and emails went unanswered at least until the refund period expired, though often went answered indefinitely. Even if a consumer was persistent enough to speak with someone at the "Resolutions Department," the consumers were cajoled, intimidated, berated, and in many instances eventually denied a refund. Defendants committed the FTC Act violations in count four.

B.      *Counts Five Through Nine, Violations of the Telemarketing Sales Rule*

The TSR prohibits a number of deceptive and abusive acts and practices. *See* 16 C.F.R. § 310.3 (deceptive practices); 16 C.F.R. § 310.4 (abusive practices). Pursuant to section 3(©) of the Telemarketing Act, 15 U.S.C. § 6102(©), and section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3),

1  a violation of the TSR constitutes an unfair or deceptive trade act or practice in or affecting

2  commerce, in violation of section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

3       I.     Count Five

4       The TSR prohibits sellers and telemarketers from "[m]isrepresenting, directly or by

5  implication, in the sale of goods or services . . . [a]ny material aspect of the performance, efficacy,

6  nature, or central characteristics of goods or services that are the subject of a sales offer." 16 C.F.R.

7  § 310.3(a)(2)(iii).

8       Count five alleges that defendants violated this provision of the TSR by claiming that: (a)

9  consumers who purchased and used defendants' products and services were likely to earn thousands

10  of dollars per month from their internet business endeavors; (b) within six months, a purchaser's

11  internet business would generate income equal to or greater than the amount they paid to purchase

12  the program; (©) defendants would provide all the services necessary for consumers to establish

13  successful internet businesses, including individual coaching sessions, online resources, and web site

14  design and development for six months or until purchasers recouped their initial investment; and,

15  (d) defendants would provide numerous other related products and services, including access to

16  corporate credit and tax advice and assistance.

17       Unsubstantiated claims concerning earning potential plainly violate the TSR. Deceptive

18  claims concerning the goods and services that a seller will provide also violate the TSR. *See, e.g.,*

19  *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 636 (7th Cir. 2005). As previously discussed in

20  section III.A.i *supra*, the undisputed facts demonstrate that defendants' claims about the income

21  consumers were likely to earn, as well as the products and services that defendants would provide,

22  were false. Defendants committed the TSR violations in count five.

23       ii.     Count Six

24       Count six of the complaint alleges that the defendants violated the TSR by failing to disclose

25  all of the material terms and conditions of their refund policy. The TSR requires sellers or

26  telemarketers to provide, in a clear and conspicuous manner, a statement informing the customer if

27  the seller has a no-refund policy or, if the seller offers refunds, a statement of all material terms and

28

**James C. Mahan**
**U.S. District Judge**

conditions of the refund policy.   16 C.F.R. § 310.3(a)(1)(iii).   A failure to disclose material conditions related to receiving a refund or that refunds will be refused for certain reasons constitutes a violation of this TSR provision.   *See, e.g., FTC v. Arlington Press, Inc.*, No. 98cv9260, 1999 WL 33562452, at * 12 (C.D. Cal. Jan. 18, 1999).

As already discussed in section III.A.iii *supra*, the court finds that defendants failed to disclose, or to disclose in a clear and conspicuous manner, all material terms and conditions of their refund policy, including that: (1) consumers had to request a refund within three days of purchase; and/or (b) consumers had to sign a non-disparagement agreement to receive a refund.  These failures to disclose violated the TSR as alleged in count six.

iii.     Count Seven

Count seven alleges that defendants misrepresented material aspects of the nature and terms of their refund policy by assuring consumers that they would be able to receive a full refund if they requested a refund within three days of their purchase.  The TSR prohibits sellers or telemarketers from misrepresenting, directly or by implication, any material aspect of the nature or terms of the seller's refund policy.  16 C.F.R. § 310.3(a)(2)(iv).

As already discussed in section III.A.iv *supra*, defendants did not provide refunds even to those consumers who requested refunds within three days.   Defendants committed the TSR violations in count seven.

iv.     Counts Eight and Nine

Count eight alleges that defendants initiated, or caused others to initiate, outbound telephone calls to telephone numbers on the DNC registry.  The TSR prohibits sellers and telemarketers from initiating outbound calls to a person when that person's telephone number is on the DNC registry. 16 C.F.R. § 310.4(b)(1)(iii)(B).

The defendants called numerous consumers who registered their telephone numbers with the DNC registry and continued to do so even after consumers asked defendants to stop calling.

Count nine alleges that defendants initiated outbound telephone calls to telephone numbers on the DNC registry without paying the annual fee for access to telephone numbers that are included

James C. Mahan
U.S. District Judge

- 17 -

in the DNC registry.  The TSR prohibits sellers and telemarketers from initiating outbound telephone calls to any person whose telephone number is within a given area code unless the seller or telemarketer, either directly or through another person, has paid the annual fee for access to the telephone numbers within that area code.  16 C.F.R. § 130.8.

The defendants neither accessed the DNC registry nor paid any fees.  Defendants committed the TSR violations in counts eight and nine.

C.    *Dream Financial*

The Ivy Capital enterprise undisputedly committed the various violations of the TSR and FTC Act in counts one through nine in the complaint.  The FTC has provide a mountain of evidence that the Ivy Capital enterprise committed the violations.  Defendants Benjamin Hoskins and Dream Financial do not even contest that the Ivy Capital enterprise committed the illegal practices. Defendants Dream Financial and Benjamin Hoskins argue only that they were not part of the enterprise such that liability should be imposed upon them.

The FTC is seeking injunctive and equitable monetary relief against Dream Financial.  The FTC argues that Dream Financial was an integral part of the web of interconnected companies that comprised the Ivy Capital enterprise.  The FTC argues that the defendants made their enterprise intentionally unclear and difficult to connect the pieces.

The FTC argues that Dream Financial is liable for all deceptive acts and practices alleged in this case by virtue of its being part of a common enterprise with the other corporate defendants in this action.  FTC has provided a mountain of evidence that Dream Financial is part of the common Ivy Capital enterprise and was used mostly for merchant processing with respect to upsell goods and services.

Where corporate defendants act as a common enterprise, each may be held jointly and severally liable for the deceptive acts and practices of the other.  *See, e.g., Sunshine Art Studios, Inc., v. FTC*, 481 F.2d 1171, 1175 (1st Cir. 1973) ("[P]articularly in light of the finding that petitioners operate as a single economic entity, . . . the Commission did not abuse its discretion in issuing an order running against all of them."); *FTC v. J.K. Publ'ns., Inc.*, 99 F.Supp.2d 1176, 1202 (C.D. Cal.

2000) (holding that defendants were part of a common enterprise where they "conducted their businesses through a maze of interrelated companies purportedly operating the same web sites.").

"Entities constitute a common enterprise when they exhibit either vertical or horizontal commonality–qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *FTC v. Grant Connect, LLC*, 827 F.Supp.2d 1199, 1216 (D. Nev. 2011) (quoting *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010)).  Factors that courts must consider in determining whether corporations or entities form a common enterprise are:

> common control; the sharing of office space and officers; whether business is transacted through a maze of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants.

*Id.* (quoting *FTC v. Nat'l Urological Group, Inc.*, 645 F.Supp.2d 1167, 1182 (N.D. Ga. 2008)).  A court evaluates "the pattern and frame-work of the whole enterprise." *Id.*

The Ivy Capital enterprise was deliberately complicated.  It consisted of a core group of entities based out of Las Vegas that ran the operation with merchant processing, lead management, and an outbound sales floor.  This main group of entities based out of Las Vegas included Dream Financial among its morass of entities.  The Ivy Capital Las Vegas group formed the main hub of the larger Ivy Capital enterprise that spread into Utah and California.

For the common control factor, Mr. Hoskins and his three partners (the three partners have already settled with the FTC) had direct or indirect ownership interests in all entities that comprised the larger Ivy Capital Las Vegas group, which includes Dream Financial.  The partners had equal shares or ownership shares in Dream Financial, though the individual defendants may have shared some interest in Dream Financial with non-defendant individuals.  Mr. Hoskins was the director of Dream Financial, though Dream Financial was managed by all four partners and defendant Christopher Zelig.

For shared office space, almost all of the entities in the Ivy Capital Las Vegas group shared the same address at 3027 East Sunset Road in Las Vegas.  Dream Financial shared this address with

James C. Mahan
U.S. District Judge

- 19 -

1   the majority of the other entities comprising the Ivy Capital Las Vegas group.

2        For interrelated activity and commingled funds, all the entities of the Ivy Capital Las Vegas

3   group, including Dream Financial, worked together and commingled funds to carry out all stages of

4   the business coaching scam–from the generation and distribution of leads to outbound telemarketing

5   sales to managing bogus coaching fulfillment to further marketing for upsell products and services.

6   The roles of each entity varied, but all had a distinct role to play as part of the scam.   From

7   approximately 2004 to 2009, Dream Financial sold upsell products and services, particularly in the

8   nature of incorporation services, to victims of the of the business coaching scam.   The FTC has

9   further provided evidence of money flowing into and out of Dream Financial accounts to and from

10  other entities associated with Ivy Capital.

11       The court is unconvinced by defendants' arguments that Dream Financial was a spin off of

12  the Ivy Capital enterprise.   The overall sum of evidence provided demonstrates unequivocally that

13  there was no real or meaningful distinction between Dream Financial and any other entity in the Ivy

14  Capital enterprise.   Dream Financial was part of the common enterprise, and furthered Ivy Capital

15  in the execution of its scam.

16      *D.*    *Benjamin Hoskins*

17       The FTC is seeking injunctive and equitable monetary relief against Mr. Hoskins.

18       Injunctive relief against individuals for injury to consumers resulting from a company's

19  deceptive acts or practices is appropriate if the individual either (1) "participated directly in the acts

20  or practices" or (2) "had authority to control them." *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d

21  1168, 1170 (9th Cir. 1997).

22       Participation can include an individual working at and drawing a salary from the company,

23  even if the individual is not involved in day-to-day operations. *See, e.g., FTC v. J.K. Publ'ns., Inc.*,

24  99 F.Supp.2d 1176, 1206 (9th Cir. 2000).   Where an officer participates in "acts crucial to the

25  success" of an enterprise, the officer has directly participated for the purposes of individual liability.

26  *Id.*

27  . . .

28

**James C. Mahan**
**U.S. District Judge**

- 20 -

1    Authority to control can be demonstrated by "active involvement in business affairs and the

2    making of corporate policy." *Id.* (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F.Supp. 1080,

3    1089 (C.D. Cal. 1994)). A defendant's "status as a corporate officer and authority to sign documents

4    on behalf of the corporate defendant can be sufficient to demonstrate the requisite control." *Id.* at

5    1204. A "corporate officer is presumed to be in control of a small, closely held corporation, and

6    assuming the duties of a corporate officer is probative of an individual's participation or authority."

7    *FTC v. LoanPointe, LLC*, 2011 WL 4348304, at *10 (D. Utah Sept. 16, 2011); *see also Standard*

8    *Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973) ("A heavy burden of exculpation rests

9    on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade

10   is overreaching and deception."); *FTC v. Windward Mktg.*, 1997 WL 33642380, * 13 (N.D. Ga. Sept.

11   30, 1997) ("An individual's status as a corporate officer gives rise to a presumption of ability to

12   control a small, closely-held corporation.").

13   It is appropriate to impose equitable money relief against a defendant if the above two factors

14   are shown and that the individual had some knowledge of the company's deceptive acts or practices.

15   *J.K. Publ'ns.*, 99 F.Supp. at 1204. Individuals possess the requisite knowledge if they: (1) had actual

16   knowledge of the representations; (2) were recklessly indifferent to the truth or falsity of the

17   misrepresentations; or (3) had an awareness of a high probability of deceptive conduct together with

18   an intentional avoidance of the truth. *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138-39

19   (9th Cir. 2010); *Publ'g Clearing House*, 104 F.3d at 1171.

20   i.    Injunctive Relief

21   Mr. Hoskins both directly participated in and had the authority to control the Ivy Capital

22   enterprise. The court finds that Mr. Hoskins arguments, supported by self-serving affidavits or

23   taking quotes out of context, that he was only a silent partner to be unpersuasive.[4] *See FTC v. Publ'g*

24   *Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit,

25   lacking detailed facts and any supporting evidence, is insufficient to create genuine issue of material

26   fact.").

27   ─────────────────────

28   [4] The bulk of the factual assertions of Mr. Hoskins are uncited and unsupported.

At the start of the enterprise, Mr. Hoskins was a 40% owner of Ivy Capital, Inc.–twice the ownership stake of each of the three partners. His share was later reduced to 25%, equal to the other three partners. He also had significant ownership interests in the various other entities that formed the Ivy Capital Las Vegas group and the BDD upsell group. According to Secretary of State filings, Mr. Hoskins was an officer or managing member of several of the Ivy Capital Las Vegas group entities, including Global Finance Group, Dream Financial, Logic Solutions, Oxford Debt Holdings, and Sell It Vizions.

Other individual defendants treated Mr. Hoskins as a business partner with the same managerial authority and involvement as the other three partners. He was copied and/or sent numerous emails regarding agendas for partnership or manager meetings.

Mr. Hoskins was integral to starting the enterprise by recruiting the three other partners to Las Vegas and providing them with a lead source and other start up resources. He provided consulting services and growth strategies for Ivy Capital. He was actively involved in obtaining merchant accounts for the enterprise. He had the authority to and did in fact sign contracts on behalf of Ivy Capital. Mr. Hoskins also assisted the enterprise with obtaining lead lists throughout the operation.

Mr. Hoskins participated in significant decisions for the enterprise with the other partners. He participated in partnership meetings and telephone conferences. He attended trade shows with the Ivy Capital partners and made or facilitated numerous introductions for his Ivy Capital partners to other individuals involved with e-commerce.

Mr. Hoskins was present at the Ivy Capital offices consistently throughout the operation. His business card and email signature line listed the Sunset Boulevard address, the main location for Ivy Capital. He received significant distributions and a salary.

The undisputed facts, and there is a mountain of them, demonstrate Mr. Hoskins' extensive involvement in the Ivy Capital enterprise. He participated in and had the authority to control the Ivy Capital enterprise such that injunctive relief is warranted and appropriate.

. . .

James C. Mahan
U.S. District Judge

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes a court to issue a permanent injunction whenever a defendant violates any of the laws enforced by the FTC and is likely to continue to violate such laws. *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112-13 (9th Cir. 1982). To determine whether a defendant is likely to engage in similar violations in the future, courts look to two general facts: (1) the deliberateness and seriousness of the present violation; and (2) the defendant's past record with respect to deceptive and unfair marketing practices. *See Sears, Roebuck and Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982). "Other circumstances may be weighed, including the adaptability or transferability of the unfair practice to other products." *Id.* "In the final analysis, [courts] look to the circumstances as a whole and not to the presence or absence of any single factor." *Id.*

Upon review of the record as a whole and all of conduct involved, the court finds it appropriate to permanently enjoin Mr. Hoskins and Dream Financial from engaging in, or assisting others engaged in, business coaching. Mr. Hoskins and Dream Financial are further permanently enjoined from engaging in, or assisting others engaged in, telemarketing.

Defendants cheated and scammed customers out of more than $130 million. Defendants have not shown a single customer that paid off their investment. Nor have defendants shown a single business, after being "coached" by defendants, that could be defined as "successful" under any proper definition of the term. This scam is highly adaptable to other opportunity scams. Therefore, Mr. Hoskins and Dream Financial are permanently banned from business coaching and telemarketing.

ii.     Equitable Monetary Relief

Equitable monetary relief is warranted in this case because Mr. Hoskins had an awareness of a high probability of deceptive conduct and intentionally avoided the truth. The record also demonstrates that he was recklessly indifferent to the truth or falsity of misrepresentations being made by the Ivy Capital enterprise.

Mr. Hoskins was informed that the Ivy Capital enterprise generated leads through fraudulent sales of business development products. He was included on dozens of emails discussing dishonest

credit card charge back practices.

He received documents regarding the overall sales process at Ivy Capital.  Mr. Hoskins testified that he was familiar with Ivy Capital's guarantee that it would continue to work with consumers in building a successful business if the consumers were unable to recoup their original investment (even though as previously stated that defendants have not produced a single consumer that made a profit using defendants' business coaching services).

He was sent financial reports indicating that Ivy Capital was selling millions of dollars of online business coaching to consumers.  He testified that he never saw a single report that consumers were ever recouping the millions of dollars they were spending on Ivy Capital coaching.

Mr. Hoskins' partners made him aware of customer dissatisfaction with the services, as well as complaints from state attorneys general about the practices of the Ivy Capital enterprise.  The mountain of evidence demonstrates that Mr. Hoskins had actual knowledge of the representations made by Ivy Capital and its offshoot entities, was recklessly indifferent to the truth or falsity of the misrepresentations, and had an awareness of the high probability of deceptive conduct.

The "FTC Act was designed to protect consumers from economic injuries.  As such, courts have often awarded restitution in the full amount of funds lost by consumers rather than limiting restitution solely to defendant's profits." *FTC v. Inc21.com Corp.*, 745 F.Supp.2d 975, 1011 (N.D. Cal. 2010).  The correct measure for monetary relief under section 13(b) is net sales, that is, total sales revenue or gross receipts less refunds. *Id.*; *see also FTC v. Kuykendall*, 371 F.3d 745, 765-66 (10th Cir. 2004) (en banc) (summarizing previous FTC cases that "illustrate that allowing a damages determination based on gross receipts in a case arising directly under the FTC Act furthers the FTC's ability to carry out its statutory purpose" and further ruling that the district court on remand need not offset from gross sales the value of the product that consumers received).

Such an award "furthers the purposes of the statute by encouraging businesses who are found to have participated in unfair or deceptive acts or practices to settle with [their] consumers (through the FTC) quickly and fairly, thereby avoiding lengthy litigation." *Grant Connect*, 827 F.Supp.2d at 1234.

James C. Mahan
U.S. District Judge

- 24 -

The court finds that Mr. Hoskins is liable for full restitution by virtue of his knowledge of the Ivy Capital enterprise scam. The court finds that Dream Financial is liable for full restitution by virtue of the common enterprise with the other entities involved in the Ivy Capital enterprise scam. Both Benjamin Hoskins and Dream Financial are jointly and severally liable along with the other defendants in this case that have already settled with the FTC. The restitution limited to just net sales of business coaching and other fraudulent upsell services is $130,375,057.52, plus prejudgment interest.

Where, as here, consumers suffer economic injury resulting from the defendants' violations of the FTC Act, equity requires monetary relief in the full amount lost by consumers. *See FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009).

**IV.   Relief Defendants**

Count ten of the complaint alleges a single cause of action against the three remaining relief defendants: Ms. Hoskins, Oxford Financial, and Mowab.

"The broad equitable powers of the federal courts can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong." *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998). "The creditor plaintiff must show that the [relief] defendant has received ill gotten funds *and* that he does not have a legitimate claim to those funds." *Id.* at 677 (emphasis in original). Upon such a showing, the remedy is an equitable monetary judgment in the amount of the funds that the relief defendant received. *See id.*; *see also SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) ("[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset . . . .").

Oxford Financial received funds derived from the fraudulent activities of the Ivy Capital enterprise. Oxford had one bank account at Far West Bank and, according to bank records, received $1,529,292.65 from the Ivy Capital enterprises between May 2007 and January 2011. These funds from the Ivy Capital enterprises were ill gotten because of the scams and fraudulent activity perpetrated by Ivy Capital on the public. Oxford Financial must disgorge the $1,529,292.25, plus

James C. Mahan
U.S. District Judge

1  prejudgment interest.

2      Next, Ms. Hoskins is liable because Oxford Financial was the alter ego of her and Mr.

3  Hoskins.  Under Nevada law, "[t]here are three general requirements for the application of the alter

4  ego doctrine: (1) the corporation must be influenced and governed by the person asserted to be the

5  alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the

6  other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity

7  would, under the circumstances, sanction fraud or promote injustice."  *Polaris Indus. Corp. v.*

8  *Kaplan*, 747 P.2d 884, 886 (Nev. 1987) (citing *Frank McCleary Cattle Co. v. Sewell*, 317 P.2d 957,

9  959 (Nev. 1957)).

10     Ms. Hoskins was a 51% owner of Oxford Financial.  She was responsible for keeping the

11 books for the company and for various operations or administrative tasks.  She personally received

12 $1,014,420 from Oxford Financial from May 2007 to January 2011.  Additionally, Oxford Financial

13 provided $110,00 in payments for such Hoskins' expenses as school tuition, a personal credit card,

14 IRS fees, and a vehicle.  She testified that she used Oxford Financial's assets for personal and

15 household expenses.

16     Ms. Hoskins argues that she should not have to disgorge amounts received from Oxford

17 Financial because she used the assets for family expenses.  She also argues that she should not have

18 to disgorge any money received because she performed work for Oxford Financial.  Ms. Hoskins

19 does not dispute that the funds she received were ill gotten.

20     The court finds neither argument persuasive.  Ms. Hoskins testified she performed only

21 administrative work for Oxford Financial, such as keeping track of money in and money out.  The

22 court finds that she really used Oxford Financial to funnel money from the Ivy Capital enterprise into

23 the Hoskins' personal accounts.  Additionally, well established case law holds that government

24 agencies, in an effort to maximize the recovery of money taken through fraud, may pursue all

25 appropriate avenues.  See, e.g., CFTC v. Gresham, no. 3:09-cv-75, 2012 WL 1606037, at *3 (N.D.

26 Ga. May 7, 2012) ("An individual may be a proper relief defendant even if she does not possess the

27 actual ill-gotten gains if she previously received benefits that were derived from another person's

28

**James C. Mahan**
**U.S. District Judge**

- 26 -

unlawful conduct."). The court finds disgorgement appropriate despite Ms. Hoskins arguments that she spent the money only on necessary family expenses (expenses that totaled over $1 million in the span of a couple years).

Mr. and Ms. Hoskins had a unity of interest and ownership with Oxford Financial. They were the only two owners of this entity. It was set up entirely to receive money from the Ivy Capital enterprise.

To permit adherence to the corporate fiction under these circumstances would sanction a fraud and promote injustice. The sole purpose of Oxford Financial with respect to the Ivy Capital enterprise was to funnel ill gotten gains from a massive scam to one of the owners of that enterprise and his spouse. Allowing the money to be shielded from collection, so that it may be potentially returned to the duped consumers, would sanction an injustice.

However, Ms. Hoskins is not liable for the entire amount of money received by Oxford Financial. Even though Oxford Financial received $1,529,292.25 from Ivy Capital (and Oxford Financial is liable for that amount), Ms. Hoskins received only $1,128,795.78. Therefore, Ms. Hoskins is liable for the undisputed $1,128,795.78 that she received from Oxford Financial.

Finally, the undisputed evidence shows that some $203,118.40 flowed into Mowab accounts from the Ivy Capital enterprise. No defendant has disputed this figure or Mowab's connection to the Ivy Capital enterprise. Mowab is required to disgorge the $203,118.40.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendant Benjamin Hoskins motion for summary judgment (doc. # 312) be, and the same hereby, is DENIED.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that relief defendant Leanne Hoskins motion for summary judgment (doc. # 320) be, and the same hereby, is DENIED.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that plaintiff Federal Trade Commissions' motion for summary judgment (doc. # 323) be, and the same hereby, is GRANTED.

. . .

. . .

**James C. Mahan**
**U.S. District Judge**

1      IT IS FURTHER ORDERED that plaintiff Federal Trade Commission shall submit a

2  proposed order consistent with this order.

3      DATED March 26, 2013.

4

5

6                     **UNITED STATES DISTRICT JUDGE**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28